In re the Marriage of Steven
MAXFIELD, Petitioner,
Appellant,

v.

Diane MAXFIELD, Respondent.

No. C3–88–2343.

Supreme Court of Minnesota.

Jan. 19, 1990.

Rehearing Denied March 15, 1990.

Jeffrey D. Pederson, Wadena, for appellant.

Cheryl Schrenk, Northwest Minnesota Legal Services, Moorhead, for respondent.

SIMONETT, Justice.

The trial court awarded custody of the four children to the father. The court of appeals reversed, awarding custody of the three youngest children to the mother and remanding the issue of the oldest child's custody to the trial court for reconsideration. We affirm.

In April 1987, after 10 years of marriage and four children, Steven and Diane Maxfield separated. The couple had then been living in Verndale, Minnesota, Steven's hometown, for 3 years. Two months after separating, in June, Diane and the four children returned to Wilkes–Barre, Pennsylvania, Diane's hometown, ostensibly for a visit, but actually because Diane had decided to end the marriage.

Unable to persuade Diane to return to Verndale, Steven filed a separation action requesting custody of the four children. Diane countered with a dissolution petition and requested custody of the children. A year later, in July 1988, the case was called for trial. During that year the children were with their mother in Pennsylvania. At the time of trial Steven and Diane were both 34 years old. The three youngest children, Jacinta, Therese, and Aleshia, were 2, 4, and 8 years, respectively. The oldest child, Jeremiah, was 10.

The trial judge heard the testimony of the parties and their witnesses and received in evidence reports from the social services personnel of Luzerne County, Pennsylvania, and Wadena County, Minnesota. The court made the following (here abbreviated) findings of fact:

1. While the family was together in Verndale, Steven was away at trade school and at work, and the care of the four children, for the most part, fell to Diane.

2. Diane was home alone with the children most of the time. She had no car, no phone, few friends, and little money. She felt isolated in the small rural community and became depressed. Her housekeeping was seriously substandard. Diane sought counseling from Wadena County Social Services for her loss of self-esteem and self-confidence. In April 1987, at Diane's request, Steven moved out of the house and lived in a pickup camper in a woods on a friend's property. Steven spent time with the family, however, virtually every weekend.

3. About the end of June, Diane returned to Pennsylvania with the four children. She told Steven it was only for a visit, and Steven along with Diane's mother paid for the air fare; in fact, Diane intended to stay in Pennsylvania. Diane kept her residence a secret and Steven was almost totally cut off from contact with his family. Steven did, however, visit with the children in Pennsylvania over the Thanksgiving weekend, and in June 1988 for a few weeks prior to and during trial, the children lived in Steven's home.

4. Diane appeared to be doing a satisfactory job of homemaking and housekeeping in her subsidized housing apartment in Pennsylvania, as reported by the social worker. The two oldest children did well in school but Jeremiah felt picked on.

5. Steven and Diane had met and were married while Steven was in the Army. When Diane returned to Pennsylvania she met a much older man, through an advertisement, and planned to marry him. (This man testified at trial.) There was some evidence that Jeremiah did not like this proposed marriage. The proposed marriage would introduce an element of "disequilibrium" into the family setting, as the children would move once again. (Since the trial these marriage plans have been abandoned.)

6. Jeremiah and Aleshia, the two oldest children, were interviewed by Dr. Ralph Scheer, a psychologist, who also serves in the Wadena County guardian ad litem program. This was pursuant to an arrangement made by counsel and the court. Jeremiah told Dr. Scheer the housing project was noisy, with much bad talk, and the children missed their pets on the farm. Dr. Scheer attempted to elicit the two children's custodial preference without asking them directly to choose between the parents. The two children expressed a preference for Verndale.

7. Dr. Scheer felt that Aleshia, then 8, was not mature enough to express a valid preference. He did feel that Jeremiah definitely preferred a small-town environment and life style, which could be interpreted as the boy's preference to live with his father. Even though Jeremiah had done well in school in Pennsylvania, he felt more "at home" in Verndale.

8. Steven now has a full-time, permanent job. For the time being, Steven's mother helps with the children in the morning before Steven goes to work and takes them to the babysitter for the day. At the end of the day, the grandmother picks up the children and takes them to Steven's home and waits until Steven gets home from work. Steven has demonstrated that he is able to provide for the needs of the children.

After making the foregoing findings of fact, the trial court then made the following (here summarized) conclusions of law:

(1) When the parties separated in April 1987, Diane was the primary parent as defined in *Pikula v. Pikula,* 374 N.W.2d 705 (Minn.1985). More than a year has gone by, however, between the time when the parties separated (April 1987) and the date of trial (July 1988), and, therefore, "it is appropriate for the Court to consider the events and developments which occurred in that intervening period * * *."

(2) The *Pikula* presumption of primary parent does not apply when a child is old enough and mature enough to express a meaningful custodial preference. Here, both Aleshia and Jeremiah expressed a preference, and Jeremiah at least was of an age and maturity to express a valid preference. "The presumption created by *Pikula* does not apply."

(3) In considering the best interests of the children under Minn.Stat. § 518.17,

subd. 1 (1988), a consideration of the evidence "points unmistakably toward an award of custody in favor of Steven." In this connection:

(a) Both of the older children prefer Verndale.

(b) One or more of the children have a particularly close relationship with the paternal grandmother.

(c) While the report cards of the two oldest children suggest "things out east were perhaps not as bad as described by the children," nevertheless the children expressed to Dr. Scheer concerns and difficulties in adjusting to home, school and the community in Pennsylvania.

(d) An award of custody to Diane (if she remarries) presents the prospect of another change and a lack of continuity with respect to their environment in Pennsylvania. Verndale appears to present a more permanent custodial home.

(e) The expressed preference of the two older children for Verndale (even after being gone for over a year) "makes clear the degree to which the children feel a strong emotional bond with their father. Thus * * * an award of custody to the father would be consistent with maintenance of continuity and stability for the children with respect to emotional and psychological attachment to the primary psychological parent."

(f) There is a strong likelihood that Diane, if awarded custody, would restrict Steven's contacts with the children, destroying any meaningful relationship the father might hope to have with the children.

As noted, the trial court awarded custody of the four children to the father. On appeal, the court of appeals reversed, awarding the three youngest children to the mother and remanding the question of Jeremiah's custody to the trial court. *Maxfield v. Maxfield*, 439 N.W.2d 411 (Minn. App.1989). We granted the father's petition for further review.

The issue, as we see it, is whether the trial court's best interests analysis was correctly applied.

### Discussion

Our concern here is not with the findings of fact but with the conclusions drawn from those facts. Particularly in cases of this kind, where the trial court is weighing statutory criteria in light of the found basic facts, the trial court's conclusions of law will include determination of mixed questions of law and fact, determination of "ultimate" facts, and legal conclusions. In such a blend, the appellate court may correct erroneous applications of the law. As to the trial court's conclusions on the ultimate issues, mindful of the discretion accorded the trial court in the exercise of its equitable jurisdiction, the reviewing court reviews under an abuse of discretion standard. *See, e.g., Berndt · v. Berndt*, 292 N.W.2d 1, 2 (Minn.1980). When the trial court's treatment of mixed questions of law and fact and its treatment of the ultimate issues may involve a misapplication of the law, the appellate court should carefully review the trial court's "expla[nation of] how the factors led to its conclusions and to the determination of the best interests of the child." Minn.Stat. § 518.17, subd. 1 (1989).

Here the trial court, quite correctly, concluded that Diane was the "primary parent" of the four children at the time the parties separated. Implicit in this conclusion was a finding that the children have a psychological and emotional intimacy with the parent who has been primarily responsible for their nurture and care.[1] The trial court also concluded, however, that the *Pikula* custodial preference for the primary parent was not applicable because the custody determination was being made some 15 months after the parents had separated. The trial court relied on *Sefkow v. Sefkow*, 427 N.W.2d 203, 212 (Minn.1988), wherein we said, "Only if this [separation] date is

---

1. As we noted in *Pikula*, 374 N.W.2d at 711, in *Berndt* we held "the enumerated statutory criteria, even absent consideration of other relevant factors, mandate that, when the evidence indicates that both parents would be suitable custo- dians, the intimacy of the relationship between the primary parent and the child should not be 'disrupted without strong reasons which relate specifically to the [primary] parent's capacity to provide and care for the child.'"

reasonably close to the actual trial does the *Pikula* analysis have any viability." In *Sefkow*, however, the parties had been litigating custody for 4½ years after separation. In this case, not only was Diane the primary parent at the time the parties separated but she continued to be the primary parent of these very young children up to the time of trial. There is no finding by the trial court that Diane is unfit to be custodian. If the *Pikula* preference applies, custody of the children, at least the three youngest, it would seem, should have been awarded to Diane.

Steven argues, however, that deference to the *Pikula* preference should not be given because the 1989 legislature, albeit since the trial, has eliminated that preference.[2] Apparently the 1989 amendments were a reaction to the mechanical way in which *Pikula* was being applied. It was never intended, however, that custody be awarded to whomever scored the most points on the *Pikula* caretaker scale (who bathed the child, who put the child to bed at night, etc.). It was recognized that other indicia of a child's best interests, although difficult to evaluate, were "plainly relevant," *Pikula*, 374 N.W.2d at 712, and that, in the final analysis, the aim was to place the child too young to express a preference where that child might best have the emotional security and nurturing environment so vital to the child's life and development. Later, in *Sefkow*, we observed that the primary caretaker doctrine is an "extension and refinement of the statutory criteria" and that "the statute mandates a multifaceted inquiry into 'all relevant factors' * * *." *Sefkow*, 427 N.W.2d at 212.

*Sefkow*, in other words, cautioned against applying *Pikula* mechanically, and the trial court, with *Sefkow* in mind, correctly conducted a "multifaceted inquiry" into "all relevant factors." Our concern is not with the trial court's approach but with the manner in which this best interests approach was applied. In discarding the presumption set out in *Pikula*, the trial court also discarded (or at least severely discounted) the evidence on which that presumption or preference was based, namely, Diane's status as the primary parent. The failure to give any credit for Diane's primary parent status, it seems to us, skews the trial court's best interests analysis. This, too, was the conclusion of the court of appeals. *Maxfield*, 439 N.W.2d at 416 n. 3.

For example, the evidence is undisputed that all four children love both their father and their mother. As Dr. Scheer put it, "I saw evidence of real love for both the mother and the father." From this the trial court concluded an award of custody to the father would be consistent with an attachment to the primary psychological parent. This conclusion, however, is inconsistent with the trial court's determination that the children's mother is already their primary parent. This inconsistency is never explained. Nothing occurred during the year between separation and trial to suggest Diane ceased to be the primary parent.

The trial court felt that the expressed preference of the two oldest children for the Verndale environment should be given great weight. It followed then, thought the trial court, that rather than split the family, all four children should be with the father. Yet this reasoning is difficult to reconcile with the fact that the four children are also devoted to their mother, that they were doing relatively well in Wilkes–Barre, and that it is the mother who has primarily cared for the children all their years up to the time of trial.

Here was a "traditional" marriage with Diane at home with the children and Steven at work full time away from the home. Diane, lonely and isolated at Verndale, be-

---

**2.** The 1989 legislature amended Minn.Stat. § 518.17, subd. 1, to provide that "the child's primary caretaker" and "the intimacy of the relationship between each parent and the child" are to be factors in deciding the best interests of the child and further mandated that none of the statutory factors enumerated may be used to the exclusion of all the others. Act of May 25, 1989, ch. 248, § 2, 1989 Minn.Laws 834, 835. In other words, the fact that one parent may be the primary caretaker does not necessarily control who gets custody. All relevant factors must be weighed in the balance.

comes listless and depressed. She returns home to Pennsylvania where her emotional health improves.[3] Her homemaking and housekeeping practices now in Pennsylvania are, as the trial court found, satisfactory. While the trial court noted the two oldest children (or at least Jeremiah) preferred living in Verndale, neither Verndale nor Wilkes–Barre was found by the trial court to be an unwholesome environment. Diane's conduct in denying Steven contact with the children when they were in Pennsylvania is not to be condoned, but the court can take measures to reinforce her assurance given at trial that Steven will have access to the children. The trial court's concern that Diane's proposed remarriage would be disruptive has been mooted.

██ In applying a best interests analysis, we recognize much must be left to the discretion of the trial court. Some statutory criteria will weigh more in one case and less in another and there is rarely an easy answer. Yet as our pre-*Pikula* cases illustrate, the golden thread running through any best interests analysis is the importance, for a young child in particular, of its bond with the primary parent as this relationship bears on the other criteria, such as the need for "a stable, satisfactory environment and the desirability of maintaining continuity" and "the mental and physical health of all individuals involved." *Rosenfeld v. Rosenfeld,* 311 Minn. 76, 81, 249 N.W.2d 168, 170–71 (1976). Usually this relationship "should not be disrupted without strong reasons * * *." *Berndt,* 292 N.W.2d at 2. Here we conclude that the trial court exceeded the proper bounds of its discretion in awarding custody of the three youngest children to Steven. Their best interests are served if custody is with Diane.

3. While social worker reports often need to be considered with caution, the Luzerne County social worker reported, "Mrs. Maxfield's housekeeping standards were excellent. * * * I also believe that her emotional state of mind had a lot to do with her lack of motivation to clean her home [in Verndale]." The report also concludes: "At this time Dianne Maxfield is providing her children with the love and stability that they need."

██ Jeremiah is old enough and mature enough to express a preference where and with whom he wishes to live during his approaching teen-age years. The appeals panel felt that Jeremiah had expressed only a geographical preference, not a custodial preference, in his interview with Dr. Scheer. We are not prepared to say that Dr. Scheer's indirect approach to custodial preference was inappropriate under the circumstances of this case. Here, a geographical preference would seem to determine custodial preference, a fact of which Jeremiah could not have been unaware. This, too, was the trial court's view. In any event, we agree that the question of Jeremiah's custody should be remanded to the trial court for reconsideration as ordered by the court of appeals. Jeremiah must now, in expressing a preference, consider the fact that living in his father's home would mean separation from his three younger sisters. Split custody is not favored. Yet, as someone has said, children come into this world one by one, and in deciding their future, this, too, must be decided one by one. We must leave this difficult issue to the trial court.

We affirm, therefore, the court of appeals' decision awarding custody of the three youngest children to Diane and remanding Jeremiah's custody to the trial court. Part III of the court of appeals' decision on matters of property division and child support was not appealed and remains undisturbed. The trial court will also, of course, have to consider the important matter of visiting rights by the noncustodial spouse and the protection of those rights.

Affirmed.

YETKA, J., dissents with opinion in which POPOVICH, C.J., and KELLEY, J., joins.

Compare *Berndt v. Berndt,* 292 N.W.2d 1, 2 (Minn.1980): "Respondent's previous behavior, which, in the trial court's opinion, demonstrated a lack of stability or judgment on her part, has no bearing on [her] present capacity to provide for the physical and emotional needs of her daughter and was improperly considered by the trial court in reaching its custody decision."

YETKA, Justice (dissenting).

I dissent because I believe that the majority opinion is a serious departure from well-settled rules governing the scope of appellate review. Moreover, I believe that it circumvents the clear intent of the legislature expressed by repeated legislative attempts, including very recent amendments to Minn.Stat. § 518.17, to eliminate inflexible and stereotypical presumptions in child custody cases. In so doing, the majority opinion ignores the proper roles of the legislature and the courts in these matters.

We have frequently been critical of the court of appeals for substituting its own findings of fact for those of the trial court. *See, e.g., Sefkow v. Sefkow,* 427 N.W.2d 203, 210 (Minn.1988); *Pikula v. Pikula,* 374 N.W.2d 705, 710 (Minn.1985). Nevertheless, that is precisely what happened in this case. By ignoring the proper scope of appellate review, the majority opinion will encourage more appeals in family law matters. In addition, it will encourage more reversals in a court where the reversal rate is already extraordinarily high.

This court has consistently held that "[a]ppellate review of custody determinations is limited to whether the trial court abused its discretion by making findings unsupported by the evidence or by improperly applying the law." *Sefkow,* 427 N.W.2d at 210; *Pikula,* 374 N.W.2d at 710. *See also Weatherly v. Weatherly,* 330 N.W.2d 890, 891 (Minn.1983); *Berndt v. Berndt,* 292 N.W.2d 1, 2 (Minn.1980). For almost a century, this court has said that, in determining who should have custody of minor children, the trial court has wide discretion; and we will not reverse unless there is a clear abuse of discretion. *La-Belle v. LaBelle,* 296 Minn. 173, 175, 207 N.W.2d 291, 292 (1973); *Meinhardt v. Meinhardt,* 261 Minn. 272, 276, 111 N.W.2d 782, 784 (1961); *Wicklem v. Wicklem,* 229 Minn. 478, 481, 40 N.W.2d 69, 71 (1949); *Menke v. Menke,* 213 Minn. 311, 313, 6 N.W.2d 470, 471 (1942); *Dacey v. Dacey,* 179 Minn. 520, 522, 229 N.W. 868, 869 (1930); *Novotny v. Novotny,* 152 Minn. 420, 422, 189 N.W. 258, 259 (1922); *see Waldref v. Waldref,* 135 Minn. 473, 473–74, 159 N.W. 1068, 1068 (1916); *Arne v. Hol-*

*land,* 85 Minn. 401, 404, 89 N.W. 3, 4 (1902). Yet, it now appears that this court is saying that, while the findings of the trial court are not erroneous, either the wrong law was applied to the case or the conclusions were invalid.

In May of 1989, the legislature attempted to clarify the law by amending Minn. Stat. § 518.17, subd. 1, effective August 1, 1989, to provide that the child's primary caretaker, as determined by the *Pikula* analysis, is only one factor to be considered in awarding custody and that "[t]he court may not use one factor to the exclusion of all others." *See* Act of May 25, 1989, ch. 248, § 2, 1989 Minn.Laws 834, 835–36. The majority seems to hold that, since that statute was not in effect at the time the trial court decided this case, the pre–1989 status of the law should apply, in which case the presumption of *Pikula* applies. Even if that were the case, the trial court makes it absolutely crystal clear in its findings that, even applying the *Pikula* standard, the presumption had been rebutted and the custody of the children in this case ought to go to Steven Maxfield. The majority opinion finds just the opposite result.

Everyone seems to agree that the best interests of the children should prevail. That standard, in my opinion, was not applied to this case. In order to demonstrate this point, I feel compelled to outline the history of the law governing contested child custody cases in Minnesota.

Until about 20 years ago, the law in Minnesota child custody cases was that, in almost all cases, the mother received custody of the parties' young children unless she was unfit. *See, e.g., Bennett v. Bennett,* 277 Minn. 227, 152 N.W.2d 187 (1967); *In re Alsdurf,* 270 Minn. 236, 133 N.W.2d 479 (1965); *Eisel v. Eisel,* 261 Minn. 1, 110 N.W.2d 881 (1961). The rule in these cases rested on the stereotypical notion that it was automatically in the best interests of a young child to live with the mother. *See Meinhardt v. Meinhardt,* 261 Minn. 272, 276, 111 N.W.2d 782, 784 (1961) ("[O]ther things being equal, the welfare of children of tender years is best served by their being left in the care of their mother."). This maternal presumption has become known as the "tender-years doctrine." *See*

Note, *A Step Backward: The Minnesota Supreme Court Adopts a "Primary Caretaker" Presumption in Child Custody Cases; Pikula v. Pikula,* 70 Minn.L.Rev. 1344, 1348 n. 18 (1986) (hereinafter *"A Step Backward"*).

Starting in the late 1960's, no-fault divorce advocates and various equal rights groups insisted that divorce statutes be amended to discard the tender-years doctrine and codify the rule that the best interests of the child be the test. *See A Step Backward, supra* at 1349 & n. 21. In 1969, the Minnesota Legislature codified the "best-interests-of-the-child" standard and prohibited consideration of the proposed custodian's gender. Act of June 6, 1969, ch. 1030, § 1, 1969 Minn.Laws 2081, 2081–82. This court, however, basically ignored the legislature's first attempt to eliminate the tender-years doctrine. *See Reiland v. Reiland,* 290 Minn. 497, 500, 185 N.W.2d 879, 881 (1971) ("This amendment does no more than express views contained in prior decisions of this court."). In 1974, the legislature amended Minn.Stat. § 518.17, subd. 1 in order to provide specific guidelines and require the courts to consider *several* factors. *See* Act of Mar. 28, 1974, ch. 330, § 2, 1974 Minn.Laws 555, 555–56; *see also A Step Backward, supra* at 1351. However, when lower courts actually started to award custody to the father in certain cases, the people who originally favored the objective statutory factors began arguing that the law should move in the opposite direction. *See A Step Backward, supra* at 1373 n. 142 (noting that, in the early 1980's, some studies indicated that mothers were losing two-thirds of all contested custody cases). Finally, this court adopted the *Pikula* rule, which provides that the primary caretaker has a presumption in his or her favor. The *Pikula* presumption basically instructs trial courts to substitute a list of homemaking duties for "all relevant factors" expressly provided in Minn.Stat. § 518.17, subd. 1. *See id.* at 1359. The *Pikula* presumption, although neutral on its face, has a readily apparent disparate impact on fathers. In other words, we seem to have completed a full cycle and are attempting to get the tender-years doctrine in through the back door so that, once again, it will be the mother who is invariably granted custody of the children unless she is found to be unfit. Whether we favor such a rule or not,[1] that is not the law in Minnesota. *See Sefkow v. Sefkow,* 427 N.W.2d 203, 212 (Minn.1988). The recent amendments to Minn.Stat. § 518.17, subd. 1 are the legislature's third attempt to force this court to abandon inflexible presumptions about who is best able to care for a young child. It seems to me that, in refusing to let go of the *Pikula* presumption, the majority, by judicial fiat, is ignoring the intent of the legislature and reviving the tender-years doctrine. *See* Op. at 222 ("the aim [of *Pikula*] was to place the child too young to express a preference where that child might best have the emotional security and nurturing environment so vital to the child's life and development").

With respect to the best interests of the children in this case, who can seriously argue against the conclusion that all of the children would be better off raised in Verndale, Minnesota, than Wilkes–Barre, Pennsylvania, in a low-cost public housing slum? In addition, the fact that Diane Maxfield took all the children from Verndale to Pennsylvania by deceit is also highly relevant in this case because it undermines the credibility of the rest of her testimony.[2] It was only when dissolution proceedings were commenced and the children were returned in 1988 for the purpose of determining custody in connection with that dissolution that Steven was able to see his children on a regular basis. The trial court

---

**1.** At least one commentator has argued for an overt resurrection of the tender-years doctrine on the grounds that, "in a society which continues to discriminate against women in every other aspect of life, a mother's preferred status regarding custody of her children is not unlike the 'reverse discrimination' and preferred status urged on behalf of historically disadvantaged groups in a variety of other contexts." Uviller, *Fathers' Rights and Feminism: The Maternal Presumption Revisted,* 1 Harv.Women's L.J. 107, 130 (1978). While I do not support the idea that "reverse discrimination" is the best way to correct past wrongs, at least this approach would have the benefit of candor.

**2.** In June 1987, respondent told her husband that she was going to go home to visit her parents in Pennsylvania, but would be back with the children and they would attempt to

then awarded custody to Steven in August of 1988, and they have been in his custody since that time. The *Pikula* presumption is supposed to be premised on the importance of stability. *Pikula*, 374 N.W.2d at 711. Even if it were appropriate for an appellate court to re-weigh the evidence, how can it be seriously argued that it would now be in the children's best interests to be uprooted for the third time and sent back to Pennsylvania?

The respondent argues that Steven must work during the day and even one weekend a month so that he wouldn't be able to spend the time with his children that Diane could. That argument is obviously fallacious because the only way that Diane could spend more time with the children than Steven if she received custody would be if she didn't work at all and was on welfare. If she gets a job, she'll have to be away from home just as Steven or any other person who must work for a living.

The trial court made 66 separate findings of fact and, from those findings, arrived at 31 conclusions of law. The majority opinion indicates that its concern is not with the accuracy of the findings of fact, but with the conclusions drawn from those findings. The majority opinion summarizes in eight paragraphs the findings of the trial court; however, I do not believe those summaries accurately reflect the entire story. Rather than be accused of omitting facts in my own summaries, I find it necessary to attach all the findings of fact and conclusions of law of the trial court to this dissent as Exhibit A.

As one can readily see from the findings of fact, the trial court has done exactly what this court has said in numerous opinions a trial court should do. *See, e.g., Rosenfeld v. Rosenfeld*, 311 Minn. 76, 82, 249 N.W.2d 168, 171 (1976) ("court must make written findings which properly reflect its consideration of the factors listed in Minn. Stat. § 518.17, subd. 1"). Mechanically applied presumptions are not useful in child custody cases. Each case is unique. A trial court must consider a great deal of testimony and other evidence, much of it conflicting. The trial court is the appropriate finder of fact and is in the best position to judge the credibility of witnesses. I doubt whether one could find a case where a trial court has spent more time and made more detailed and careful findings of fact than has been done in this case. Moreover, I submit that the trial court's conclusions of law were justified by those facts. I find it simply extraordinary that either the court of appeals or this court would take it upon itself to reverse a trial court when it can't point to one of the findings as being erroneous. In other words, we have now reverted to a rule of law in Minnesota where an appellate court will dictate a result-orientated decision rather than a principled decision based on fact or law.

For all the above reasons, I would reverse the court of appeals and reinstate the decision made by the trial court.

POPOVICH, Chief Justice (dissenting).

I join in the dissent of Justice Yetka.

KELLEY, Justice (dissenting).

I join in the dissent of Justice Yetka.

### EXHIBIT A

In the District Court Seventh Judicial District

State of Minnesota County of Wadena

In Re the Marriage of: Steven Maxfield,

Petitioner,

and

Diane Maxfield,

Respondent.

### FINDINGS OF FACT, CONCLUSIONS OF LAW, AND ORDER

The above-entitled matter came on for trial the 6th day of July, 1988, at the Court-

---

work out their marital differences. All along, she was contemplating terminating the marriage and removing the children to Pennsylvania, which she did. Thereafter, she even denied Steven's attempts to visit the children or talk with them on the telephone. He then had to get a court order to see his children. At trial, Diane testified that she intended to marry an older man whom she met through newspaper advertisements. Since trial, those plans have been abandoned. Surely, the trial court is in the best position to determine Diane's credibility and weigh that assessment along with other factors relevant to the best interests of the children.

house in the City of Wadena. Steven was personally present, and was represented by his attorney, Jeffrey D. Pederson. Diane was personally present, and was represented by her attorney, Peter M. Irvine.

Having heard and considered the testimony, having reviewed and considered the trial exhibits, including each of the Home Studies and the reports from Wadena County Social Services, having reviewed the written memoranda of counsel, being fully advised in the premises, and on all the files, records and proceedings herein, the Court now makes the following

## FINDINGS OF FACT

1. Diane and Steven were married July 27, 1977.

2. Diane and Steven met as a result of an ad which Steven placed in a local newspaper when he was in the military service and stationed in Kentucky. Diane, at that time, lived in Lucerne, Pennsylvania.

3. Diane and Steven corresponded back and forth for a couple of months after she first replied to his newspaper advertisement before they met for the first time. They saw each other then as they could manage, given Steven's military duties and the distance involved. After awhile, Steven was sent overseas. He was stationed in Italy, and he and Diane corresponded almost daily. She came to Italy to see him, he proposed, and they were subsequently married.

4. Diane grew up in the Wilkes–Barre, Pennsylvania area. Her mother, a sister, and other family members and relatives are from and live in that area. Wilkes–Barre and the surrounding area is metropolitan in character.

5. Steven was born and raised in Verndale, MN. His mother continues to reside in Verndale. Verndale is about as rural and "small-town" America as one can get.

6. Steven was in the military service for approximately 10 years. He was stationed in various locations.

7. Diane and Steven have four children. Jeremiah turned 10 on July 15 of this year. Aleshia will be 8 on August 14. Therese turned 4 on July 31. Jacinta's second birthday was on July 10, 1988.

8. The family lived in Alaska for awhile when Steven was stationed there while in military service. Steven and Diane did go for some marriage counseling at that time.

9. After Steven left the military, he, Diane and the children moved to Verndale. This apparently occurred sometime in 1984.

10. Steven made use of education benefits available through the military, and attended the Wadena Area Vocational Technical Institute starting in August of 1984. After finishing a course of studies there, he went on to take additional courses and training at the Staples AVTI. His training was in the area of computer assisted drafting and certain types of engineering. Steven completed his studies in May of 1986, and obtained employment in the field for which he had been trained in August 1986. The job was with an engineering firm from Detroit Lakes, MN.

11. After the Maxfields moved to Verndale, Steven's studies at Tech School occupied most of his time. The time required by the studies kept him away from home to the same degree, at least, as would have been the case with regular, full-time employment. During the time that Steven attended the Vo–Tech Schools in Wadena and Staples, he was a full-time student. The schooling was paid for with Veterans Administration benefits, student loans, and through the G.I. Bill. The family, during this period of time, was on food stamps and received medical assistance through Wadena County.

12. Steven has been a member of the National Guards since leaving the military service. This requires one weekend of his time each month, plus the normal two-week tour of duty once each summer or sometime during the year.

13. After Steven completed his education, the job he obtained was quite demanding in terms of the time commitment required. He typically worked an eight to nine-hour day, and he had a drive of more than an hour each way going to and from work. He worked six days a week at the

outset of his employment with the engineering firm in Detroit Lakes.

14. Steven's studies, and thereafter his employment, placed significant restrictions on the amount of time that he was at home and able to assist in directly providing for the care of the children. This responsibility fell primarily to Diane. She was the one primarily responsible for grocery shopping, meal preparation, clothes washing, the feeding and bathing of the children. Diane primarily attended to the children's medical needs and doctor's appointments, Diane typically was the one who got up with the children if they awakened in the night. [This made sense, of course, given the fact that Steven was the one going off each day to school, or to work.]

15. Steven occasionally helped dress the children after a bath or get them ready for bed. He also attended one or two school conferences with the teachers for the two school age children. For the most part, however, the everyday responsibilities of child care and child rearing fell to Diane.

16. The parents did share responsibility for the discipline of the children to a certain extent. Both parents attended church together with the children regularly each Sunday. Steven would often cook pancakes for breakfast on Saturday, and on most Sundays the family went to the home of Steven's parents, in Verndale, after attending church on Sunday morning. The Maxfields would have a meal with Steven's parents on most Sundays.

17. While Steven was attending school, and initially also after he obtained the employment with the engineering firm from Detroit Lakes, the family never really had enough money. In an effort to economize, for example, they did without a telephone. Prior to Diane and Steven's separation, which occurred in April of 1987, there was only one vehicle, which Steven used either to attend school or to go back and forth from work.

18. As a consequence of all these various circumstances, Diane came to feel cut off and isolated. She had few if any friends. She was "stuck with the children." She no longer felt close to her husband. Her mother, in Pennsylvania, was encouraging her to come back home.

19. In January, 1987, Diane contacted Wadena County Social Services, and Family Service Aide Mardell Havnes was assigned the case.

20. Ms. Havnes found that Diane's housekeeping skills were very poor. Clutter was strewn all over the house, on chairs, tables and floors. The floors were in need of sweeping and vacuuming. Cupboards, drawers and closets were in disarray. Beds were not made. There were dirty dishes accumulated from a number of meals unwashed in the kitchen.

21. The Social Worker also found that Diane had problems in her relationship with her husband. Diane had objected to having sexual relations with Steven since the birth of the oldest child. She missed her family back in Pennsylvania, she felt isolated and friendless, and she felt frustrated and worried about the lack of sufficient income or money for the family. She was also having trouble with the children. She reported to the Family Service Aide that the kids didn't listen to her, and that she yelled at them.

22. Ms. Havnes found Diane to be depressed and frazzled. Ms. Havnes arranged for Diane to obtain counseling with Dr. Terry Nelson. The Family Service Aide also made regular visits to the home. The main goal of these efforts was to improve the condition in the home, and to provide support to Diane to help her stabilize her situation. From February through May of 1987, Ms. Havnes visited at the home on at least twelve occasions. One or more additional contacts occurred at the Social Services Office. Dr. Nelson saw Diane on at least four separate occasions between March and June of 1987.

23. Ms. Havnes filed a report on May 29, 1987, about two months after she and Steven separated. At that time, Ms. Havnes reported that Diane's housekeeping skills still needed improvement. She was still depressed most of the time. The goals which had been established back in February were still not all accomplished.

24. Dr. Nelson initially assessed Diane as being basically unassertive, quite lonely and introverted. She had difficulty coping with the demands of child rearing. She possessed low self-esteem and low self-confidence. The situation was complicated, in Dr. Nelson's opinion, about how angry Diane felt about having to take the major responsibility for the care of the children and the raising of the family, and about the pressure which she felt from her husband in regards to a sexual relationship which she felt unable to fulfill.

25. Dr. Nelson set as goals for Diane efforts to build greater self-esteem, assertiveness and personal independence. He further specifically suggested to Diane that she consider marital and sexual counseling for both herself and Steven, after she had obtained a greater sense of self-esteem and self-confidence.

26. In subsequent reports to Ms. Havnes, Dr. Nelson reported Diane feeling very despondent regarding Steven's moving out of the home, even though Steven moved out at Diane's insistence. Nelson provided some counseling for Diane in the areas of utilizing resources and problem solving. He found her to be in need of alot of nurturing and support.

27. Sometime in February 1987, Diane told Steven that she wanted him to move out. This request on Diane's part was economically difficult to accomplish, given the family's marginal financial resources. Ultimately, Steven was able to find a way to comply with her request. Sometime in April, he began living in a camper pickup parked in a woods near a lake on some property owned by a friend near Frazee, MN. It was apparently at or about this time that the family acquired the 1977 Grenada automobile, which Diane had available for her use.

28. The reports of the Family Service Aide and Dr. Nelson confirm that following the separation, Steven saw the children virtually every weekend, either at the family home, or more typically, at the home of his parents in Verndale. The family continued to go to church together most Sundays. Steven's responsibilities as a member of the National Guards did prevent him from seeing the children approximately one weekend out of each month. Contact between the children and their father also occurred on a number of occasions when Diane brought the children to visit their father at the wooded lot where he lived in the pickup camper near Frazee.

29. It does not appear that Diane was ever very straight-forward or forthcoming with Steven regarding her contacts with Mardell Havnes, the goals of that Social Service agency involvement, or with regard to her counseling with Dr. Nelson. Steven, as a result, was not involved in those efforts. Essentially, Diane sought help for her own needs, to try to get her own life in order. She did not seek help for the sake of the relationship with Steven, or for the purpose of trying to maintain the family unit.

30. The Wadena County Social Service file on Diane was closed in July, 1987. By the end of June, Diane had decided to move back to Pennsylvania. She made arrangements to obtain money from her mother for bus or train fare for herself and the children. She arranged as well to ship a number of personal belongings back to Pennsylvania.

31. When Diane had decided to move back to Pennsylvania with the children, she knew at that time that she would not return. Nonetheless, she told Steven something quite the contrary. She discussed her wish to move back to Pennsylvania with Steven, but merely told him that she would be going back to live with her parents, that it would be a temporary thing, and she specifically agreed to come back to Minnesota not later than December, and she promised even that she would go for counseling with him upon her return.

32. On the basis of these commitments and assurances, Steven, who was desperately hoping to maintain the marriage and keep the family intact, agreed to Diane and the children going to Pennsylvania. He felt that such a long bus or train ride would be too much for the children, or too much for Diane with all four children, and he came up with enough money so that

funds which he provided, coupled with the money being sent by Diane's mother made it possible for her and the children to fly back to Pennsylvania.

33. After Diane and the children arrived in Pennsylvania, Steven was almost totally cut off from contact with his family. He was prohibited contact not only with Diane, but also with the children. Diane stayed with her mother for a few weeks, and occasional phone contact by Steven with the children occurred while she lived there. But after a short while, she moved out of her mother's home, and Diane refused to disclose the address or location of the new residence.

34. Steven's only way of trying to reach her was through Diane's mother. When he called to speak to the children, they were almost always unavailable. From the end of June of 1987 through November of that year, Steven was cut off from his children as the result of intentional conduct and action on Diane's part. Steven testified that he could only recall three occasions on which he had direct contact with one or more of the children in that entire period of time.

35. Diane's ongoing deficiencies as a housekeeper and a homemaker while in Minnesota were confirmed upon Steven's return to the marital home in Verndale following Diane's departure with the children for Pennsylvania. The home was a mess. Steven and his mother removed over 10 bags of junk and garbage just from the kitchen alone. After Steven moved out in April, Diane did seem to do a better job in and around the home than had been the case before, at least for awhile. But then she seemed to revert to prior habits, and things got pretty bad once again.

36. When Diane left her mother's home after relocating to Pennsylvania, she found a place for herself and the children in a low income housing project. This residence is described in some detail in the Pennsylvania Home Study Report. Diane appears to be doing a satisfactory job of homemaking and housekeeping in that particular environment.

37. With respect to future plans, Diane now plans to be married to a gentleman named Mr. Trevor Hunt. Mr. Hunt is 55 years of age, and himself divorced. His children are all fully grown. He and Diane met as a result of an advertisement which he had placed in a local paper. Mr. Hunt has a large six-bedroom home located some 25 or 30 miles from Diane's present residence.

38. Diane's relationship with Mr. Hunt was not commented upon in the Pennsylvania Home Study. Of particular concern with respect to that relationship is its impact upon the children. There is some evidence to suggest that the oldest child is concerned about Diane's involvement with Mr. Hunt, and there is evidence to indicate that Jeremiah does not like or trust him.

39. The degree to which this information is accurate is difficult to assess. Certainly it would not be unnatural for a child, particularly a boy, and perhaps especially when that child is the oldest of the four children, to be threatened and disturbed by the mother's involvement with another man, since such a relationship would tend to usurp the boy's role as the man in the family. Mr. Hunt himself, however, expressed some concern and uncertainty about how the children would view his relationship or marriage to Diane, including the substantial age difference between them.

40. Diane's relationship with Mr. Hunt, and her plans to marry him, introduce an element of uncertainty and disequilibrium into the home setting and environment for the children if they are returned to Pennsylvania. It appears that Diane intends to move forward on her plans for remarriage promptly upon finalization of the dissolution here in Minnesota. If she is awarded custody, this will mean that the children would move to a different, all be it spacious and comfortable home, begin school in yet another new school district, be moving to a new neighborhood, have to make new friends, and be required also to make all the various adjustments that would result from the remarriage and relocation.

41. The two older children were interviewed by Dr. Ralph Scheer, one of the

individuals who serves as Court-appointed Guardian Ad Litems in Wadena County. Dr. Scheer's involvement in this case resulted from steps taken and arrangements made by the attorneys.

42. Dr. Scheer's findings tend to confirm certain information conveyed to the Court through Steven regarding the school, home and neighborhood in Pennsylvania. Jeremiah reports through Dr. Scheer that he was picked on at school, among other things because of his "big ears." The low income housing project in which the children lived with their mother exposed them to alot of bad talk and four-letter language. The housing project tended to be boisterous and noisy. The children missed the pets and animals at the farm. They felt that they were picked on, at school or in the neighborhood. Their toys often got broken. Jeremiah felt that he was unable to please or satisfy his teachers, and that they were always finding fault with him.

43. Dr. Scheer very carefully attempted to elicit from Jeremiah and Aleshia their preference regarding a place to live without asking either child to pick as between the parents. Both children expressed a preference for Minnesota over Pennsylvania. Jeremiah, for example, made clear that he preferred the home, the church, the school and the community in Verndale as compared with what was available in Pennsylvania. Aleshia expressed a similar viewpoint.

44. Dr. Scheer did not feel that Aleshia was really old enough or mature enough to express a valid opinion. In his view, her opinion was not one in which the Court should place too much stock or importance. Dr. Scheer saw Aleshia as a worried, frightened and confused eight-year old.

45. Dr. Scheer was of the firm opinion that Jeremiah was old and mature enough to express a valid viewpoint. And to Dr. Scheer, what came through strong and clear from Jeremiah was his definite expression of a preference for a small-town environment and life style.

46. Jeremiah's viewpoint is particularly important and persuasive in this case given the fact that he was only back in Minnesota for a couple of weeks before the time of his interview with Dr. Scheer, and the fact that he had been out in Pennsylvania with his mother and virtually cut off from contact with his father for a whole year prior to this expression of that viewpoint.

47. This child's expressed preference for the environment in Verndale as compared with anything available in Pennsylvania cannot be easily discounted or dismissed. In effect, Jeremiah was conveying to us, through Dr. Scheer, his own sense of where his protection and well being could best be preserved and furthered.

48. A further indication of the degree to which Jeremiah's expression of preference and viewpoint should be seriously considered can be seen from the fact that he did so well in school in Pennsylvania, and yet felt distressed, picked upon or victimized by both students and teachers at that school. As Dr. Scheer specifically indicated, Jeremiah simply feels alot more comfortable, alot more "at home", here in Verndale than in Pennsylvania. This includes Mr. Hunt's home. It is not insignificant that Jeremiah and the other children had visited with their mother at Mr. Hunt's home on a number of occasions prior to this Court proceeding.

49. Steven has no plans to move from this immediate area.

50. He is now working in a permanent, full-time position with a firm located in Clarissa, MN. Steven has about a half hour drive each way to and from work each day.

51. If Steven is awarded custody, he plans to secure a live-in homemaker to assist him with meal preparation, housekeeping and homemaking. Prior to trial, Steven had lined up two separate individuals for this purpose, in anticipation of the children returning to spend some time here in Minnesota with him this summer. Each of those two individuals ultimately proved to be unavailable, however, because the date of return of the children changed, and the individuals took other employment opportunities.

52. For the time being, Steven's mother, the paternal grandmother of the children, helps out each morning before Steven goes to work. She gets the children dressed and ready for the day. She helps them with their breakfast. She gets them to the babysitter before going to her own job. Mrs. Maxfield then picks the children up from the daycare provider after she is done work and takes them to Steven's home until he returns home from work each evening.

53. Even though Steven was not significantly involved in the child rearing or housekeeping activities during the time that he and Diane lived together, Diane herself admitted that the children appeared healthy, well fed and well cared for during the time they were with their father since their return to Minnesota prior to the Court hearing. Steven has demonstrated that he is capable and able to provide for the needs of the children if he is awarded physical custody.

54. The children have a good relationship with Mrs. Maxfield, and she appears to be quite devoted to them. Aleshia, for example, appears to be particularly close to her grandmother. Following the first of Aleshia's two interviews with Dr. Scheer, she was upset and troubled. The child asked to see grandma, and Steven made arrangements for that to be done.

55. Child care provided by Steven and a live-in nanny, with some help from Steven's mother, would in fact involve less change or disruption for the children than would be the case upon a return to Pennsylvania, where they would be moving out of the home, school and community in which they have resided for the past year to live with their mother in Mr. Hunt's home. The uncertainties and adjustments facing the children back in Pennsylvania if custody is awarded to Diane are actually greater than would be the case for them upon an award of custody to Steven.

56. With respect to personal property, Diane has requested that she be awarded those items identified on Respondent's Exhibit 3.

57. The evidence supports a Finding that the bedroom set belonged to Diane prior to the marriage. Accordingly, she is entitled to an award of the following items: twin bedframe, double dresser, chest of drawers, double mirror and night stand.

58. Diane was awarded the crochet hooks, craft books and liquid paints at the time of trial. That award is confirmed.

59. The evidence indicates that the youngest child is still making use of the crib and crib mattress. Based on that child's need, then, the crib and mattress are awarded to Steven.

60. Steven will have a greater need for the deep fryer and crockpot in connection with his efforts to meet the meal preparation needs of the children. Accordingly, those two items are awarded to Steven.

61. Steven does have a garden. An award of the garden hoses to him would not be improper. There is a lawn to be mowed and a yard to be cared for at Steven's residence, and he has a need at least as great as Diane for an award of the lawnmower. The item described as a "sweeper" on Exhibit 3 is used in household cleaning. Diane and Steven have approximately similar need for this item. It is awarded to Diane.

62. There are two motor vehicles, a Ford Grenada which was purchased about the time Steven moved out of the marital home, and a 1980 pickup with approximately 130,000 miles on the odometer.

63. Since Diane moved to Pennsylvania, Steven has rebuilt the engine on the Grenada and equipped it with new tires. He has made a substantial post-separation cash investment in that motor vehicle.

64. The pickup does not have sufficient interior space or room in the cab for the safe and routine transportation of all the children at one time. The transportation needs of the children clearly suggest that the Ford Grenada should be awarded to the parent who is given custodial responsibility for the children.

65. Steven's net monthly income from all sources, including regular employment, some modest disability payments, and Na-

tional Guards, totals approximately $1,254 per month. That income is sufficient for his needs, and will be marginally adequate to permit him simultaneously to provide for the needs of the children.

66. Diane is receiving public assistance. The grant for her alone is in the approximate amount of $562 per month. This is sufficient to meet her own basic and necessary monthly living expenses. Diane's circumstances with respect to income and economic status may change if she obtains employment, remarries, or moves to different housing.

From the foregoing Findings of Fact, the Court now makes the following

## CONCLUSIONS OF LAW

1. At the time the parents initially separated, in April 1987, Diane was the primary parent within the meaning of that term as described in *Pikula v Pikula*, 374 N.W.2d 705 (Minn.1985).

2. However, as was made clear in *Sefkow v Sefkow*, a Minnesota Supreme Court decision which appears in *Finance & Commerce*, July 15, 1988, utilization of the *Pikula* primary parent doctrine and presumption should be utilized only if the date of separation "is reasonably close to the actual trial ..." Here, more than a year has gone by between the time of initial parental separation and the trial date. Thus, it is appropriate for the Court to consider the events and developments which occurred in that intervening period of time in resolving the custody issue in this case.

3. Moreover, when a child is of an age and maturity sufficient to express a meaningful preference regarding his or her custody, the presumption in favor of the primary parent created in *Pikula* does not apply. See *Petersen v Petersen*, 395 N.W.2d 586, 588 (Minn.App.1986), *pet. for rev. denied*, December 17, 1986; *Uhl v Uhl*, 395 N.W.2d 106 (Minn.App.1986); *Smith v Smith*, Court of Appeals, *Finance & Commerce*, June 24, 1988, at p. 17; *Sefkow v Sefkow, supra.*

4. Here, both Aleshia and Jeremiah expressed a preference regarding their placement and custody, and the testimony of Dr. Scheer made it perfectly clear that Jeremiah, at least, was of an age and maturity sufficient to permit him to express a valid and legitimate preference. The presumption created by *Pikula* does not apply.

5. With respect to the best interests of the children, and the factors identified in M.S. 518.17, subd. 1, the evidence here with respect to several of those factors, particularly when the cumulative weight of that evidence and those factors is considered, points unmistakably toward an award of custody in favor of Steven.

6. Specifically, both of the older children prefer to reside in the home, community, school and environment available through their father in Verndale. Thus, 518.17, subd. 1(b) tips the scale, in this case, in favor of an award to Steven.

7. One or more of the children have a particularly close relationship with Mrs. Maxfield, the paternal grandmother. Here, too then, a consideration of 518.17, subd. 1(c) would slightly tip the scales in favor of an award of custody to Steven.

8. The children, through the Guardian, put before the Court evidence regarding concerns and difficulties with respect to their adjustment in the home, school and community provided by their mother in Pennsylvania. The objective measure of their academic and social achievement as reflected in the report cards of the two older children (Exhibits 1 and 2) would suggest that things out east were perhaps not as bad as described by the children, but nonetheless here also a consideration of 518.17, subd. 1(d) appears to favor an award of custody to Steven, particularly when one considers the testimony regarding the adjustment of the children out east in light of their stated preference for the environment available in Verndale.

9. As is detailed in my Findings, the children, if an award of custody is made to Diane, will be faced with the prospect of a change in home, school, community and environment in Pennsylvania. Because of that, an award of custody to Diane would not maintain continuity with respect to home, school, community, environment,

friends or playmates. An award of custody to Steven, on the other hand, would permit the children to continue with a placement in Verndale for which the two older children express a preference, in which they have been doing well this summer, in which they lived for about three years prior to Diane's relocation to Pennsylvania, and which appears to be both stable and satisfactory. A consideration of 518.17, subd. 1(e) also tilts the scales in favor of an award of custody to Steven.

10. The observations set forth in Conclusion of Law # 9 above apply with equal force with respect to the permanence of the existing or proposed custodial home. Thus, consideration of M.S. 518.17, subd. 1(f) also favors an award of custody to Steven. See Findings 42, 45, 46, and Findings 48–55.

11. Two additional points need to be made with respect to the custody determination.

12. First, a consideration of the concept of primary psychological parent, as discussed in *Regenscheid v Regenscheid*, 395 N.W.2d 375 (Minn.App.1986), *pet. for rev. denied*, December 23, 1986, particularly when that concept is considered in light of the expression of a preference for the Verndale environment by the two older children (even though they were separated and cut off from their father for almost a year), makes clear the degree to which the children feel a strong emotional bond with their father. Thus, a consideration of the intimacy of the relationship between the children and either parent, as discussed in *Berndt v Berndt*, 292 N.W.2d 1 (Minn. 1980), as well as in *Sefkow, supra*, leads here to a conclusion that an award of custody to the father would be consistent with maintenance of continuity and stability for the children with respect to emotional and psychological attachment to the primary psychological parent.

13. A second point is equally important, and it relates to the capacity of the parents to provide the children with love, affection and guidance. See M.S. 518.17, subd. 1(h).

14. As was discussed in *Randall v Stuart*, Court of Appeals, *Finance & Commerce*, July 8, 1988, pp. 5–8, conduct by one parent which effectively prohibits or excludes contact by the other parent with the children over an extended period of time is evidence properly able to be considered in determining which parent has the greater capacity and disposition to provide for the children's needs. One of those needs, obviously, will be the continued maintenance of a relationship with the parent that does not prevail in a contested custody dispute.

15. Here, Diane has demonstrated by her conduct the strong likelihood that an award of custody to her would result in such restrictions and difficulties regarding Steven's contact with the children as to effectively destroy any real opportunity for maintenance of a meaningful relationship by the father with these children. See Findings 33–36.

16. The Court in *Randall v Stuart* specifically held that when the evidence relating to the statutory factors affecting the best interests of the children do not clearly favor an award of custody to either parent, the trial court could then consider as *determinative* evidence showing which parent will support the children's relationship with the non-custodial parent. Consideration of the "maintenance of relationship" factor here clearly favors an award of custody to Steven.

17. In *Randall*, consideration of this factor was determinative when the evidence regarding the choice of custodial parent was otherwise about even. Here, consideration of this factor is all the more probative, since it combines with consideration of a number of other 518.17, subd. 1 factors to indicate that the best interests of the children will be served by an award of custody to the father.

18. Moreover, even if I am wrong about some of the other statutory factors, *Randall v Stuart* would suggest the appropriateness of an award of custody to Steven here if everything else regarding custody was equal.

19. Steven is entitled to an award of sole physical custody.

20. Given the geographic distance between the two separate proposed custodial homes, and given the emotional gulf that divides the parents (at least as described by Diane in her testimony and as is detailed in the reports of Mardell Havness and Dr. Nelson), an award of joint legal custody would be neither proper nor practical in this instance. Accordingly, Steven is also awarded sole and exclusive legal custody of the children.

21. The question of child support is reserved.

22. Diane is entitled to reasonable visitation with the children. Given the geographic distance separating the homes of the two parents, visitation in Pennsylvania will only be possible with advanced planning and prior arrangement. Moreover, the great distance involved will most probably make non-Minnesota visitation difficult to arrange except during the summer and perhaps at Christmas.

23. With respect to visitation to occur outside the State of Minnesota, visitation shall be as follows:

a. Not more than six days during the children's Christmas school vacation.

b. Not more than 35 days between mid-July and late August each summer.

c. The summer visitation shall come to an end so as to permit the children to be back home with their father at least seven calendar days prior to the first day on which any of the children begin school in the fall.

24. Given the Court's reservation of the question of child support, and so long as the homes of the parents are separated by a considerable geographic distance, the cost of non-Minnesota visitation shall be at Diane's expense.

25. To obtain Christmas vacation visitation, Diane shall give Steven written notice of the dates during which such visitation will occur, and the transportation arrangements that are being made, at least 14 calendar days prior to the first date on which such visitation will commence. If air, train or bus travel is involved, Steven shall at his expense bring the children to the airport, bus or train depot for the trip to start visitation and pick them up at the end of the visit at the airport or depot.

26. To obtain summertime visitation, Diane shall give Steven written notice of the dates during which such visitation will occur, and the transportation arrangements that are being made, at least 30 days prior to the first date on which such visitation will commence. If air, train or bus travel is involved, Steven shall at his expense bring the children to the airport, bus or train depot for the trip to start visitation and pick them up at the end of the visit at the airport or depot.

27. With respect to the personal property, Diane is awarded the twin bedframe, the double dresser, the chest of drawers, the double mirror, the nightstand, the sweeper, the crochet hooks, craft books and liquid paints.

28. Steven is awarded the deep fryer, the crockpot, the garden hoses, the lawnmower, the pickup and the Ford Grenada.

29. With respect to other personal property, each parent is awarded those items of personal property now in his or her possession and control.

30. Neither Steven or Diane is awarded maintenance.

31. Steven and Diane shall each pay his or her own costs and attorney's fees.

From the foregoing Conclusions of Law, the Court now makes the following

### ORDER

1. Judgment should be entered in accordance with the Findings of Fact and Conclusions of Law set forth above.

2. Mr. Pederson is directed to provide for review by the Court and approval by myself and the Court Administrator an appropriate Judgment and Decree. That document should include, by way of Appendix or attachment, paragraphs or sections relating to child support, parental kidnapping, and other similar provisions as is required by law.

Dated this 15th day of August, 1988.

/s/   Timothy J. Baland

TIMOTHY J. BALAND
Judge of District Court