**Chancellor MANOR, Appellant,**

v.

**Judy GALES, et al., Respondents.**

**No. C7–02–84.**

Court of Appeals of Minnesota.

Aug. 27, 2002.

Chad McKenney, Donohue McKenney, Ltd., Minneapolis, MN, for appellant.

Lisa R. Hollingsworth, Southern Minnesota Regional Legal Services, Inc., Prior Lake, MN, for respondents.

Considered and decided by HANSON, Presiding Judge, ANDERSON, Judge, and HALBROOKS, Judge.

## OPINION

HALBROOKS, Judge.

Appellant challenges the dismissal of its eviction action against respondents, arguing that the trial court erred in finding that appellant did not suffer an adverse financial effect from its repeated disputes with respondents so as to warrant eviction under the Department of Housing and Urban Development guidelines. Because we conclude that the administrative costs incurred by appellant constitute an adverse financial effect, we reverse and remand.

## FACTS

Appellant Chancellor Manor owns an apartment building in Burnsville and rents to respondents Judy Gales and Rasheda Gales through a Department of Housing and Urban Development (HUD) subsidized program. Appellant has filed at least 68 late-rent notices and 8 prior unlawful detainer/eviction actions against respondents since October 1992. Respondents always eventually paid the rent due and the penalties and other costs that appellant could recover under the law. Appellant often worked out special arrangements with respondent Judy Gales to help her avoid missing work and incurring legal fees.

Appellant filed the latest eviction action on October 25, 2001, after respondents failed to pay rent for September and October. Appellant instructed respondents to vacate the premises by November 30, pursuant to a HUD provision in the lease permitting eviction for repeated minor lease violations that have an adverse financial impact on the program. After receiving this notice, respondents paid rent for September, October, and November. Respondents also tendered rent for December, but appellant rejected the December payment because it wanted respondents to vacate the apartment by November 30. Appellant denied respondents' internal appeal.

Wendy Howell, site manager at respondents' building, testified on behalf of the appellant at a bench trial. Howell testified that filing a late-rent notice involves filling out the required paperwork and then copying, filing, and mailing the forms. She stated that the steps to file an eviction action include preparation of the eviction forms by the home office, driving to the home office to pick up the forms, filing them at the courthouse, serving the documents on the subject-residents, and re-filing them at the courthouse. Howell estimated that the eviction-notice process takes approximately three hours, not including any time spent in the ensuing court proceedings. She also testified that respondents paid all the late fees and court costs that they owed, but that appellant paid its own attorney fees.

The trial court acknowledged that respondents had paid their rent late many times in the past, but found that appellant had recovered all its costs allowed under the law. While recognizing that appellant incurred attorney fees from these disputes, the trial court concluded that appellant could have avoided fees by having one of its employees represent it in these actions. As a result, the court dismissed the case on the ground that appellant failed to prove that it had suffered an adverse financial effect from respondents' late payments. This appeal follows.

## ISSUE

Did the trial court err in finding that appellant did not suffer an adverse financial effect in its repeated disputes with respondents?

## ANALYSIS

■ Appellant argues that the trial court erred in finding no adverse final effect when the record shows the considerable time and expense incurred due to respondents' repeated violations. Appellant contends that its costs above and beyond those that it can legally recover constitute an adverse financial effect. Respondents claim that the record supports the trial court's findings because appellant recovered all those costs to which it is legally entitled and because the law permits respondents to redeem the property by paying the rent and costs due. Respondents also argue that appellant is estopped from acting on respondents' late payments because it failed to follow through with prior threats to do so.

■ We review the trial court's factual findings for clear error, but independently apply the law to those facts. *Maxfield v. Maxfield*, 452 N.W.2d 219, 221 (Minn.1990). The interpretation of HUD regulations is a question of law, which we review de novo. *See Minneapolis Pub. Hous. Auth. v. Lor*, 591 N.W.2d 700, 702 (Minn.1999) (independently reviewing the import of HUD regulations).

■ HUD regulations apply to all participants in HUD-subsidized housing programs. *Chancellor Manor v. Thibodeaux*, 628 N.W.2d 193, 196 (Minn.App. 2001). These regulations outline the conditions under which landlords may evict tenants. *Oak Glen of Edina v. Brewington*, 642 N.W.2d 481, 485 (Minn.App.2002). The relevant regulation, also incorporated into respondents' lease, permits a landlord to evict a tenant for material noncompliance with the rental agreement. 24 C.F.R. § 247.3(c) (2001). Material noncompliance is defined, in relevant part, as:

(2) Repeated minor violations of the rental agreement that:

(i) Disrupt the livability of the project,

(ii) Adversely affect the health or safety of any person or the right of any tenant to the quiet enjoyment of the leased premises and related project facilities,

(iii) Interfere with the management of the project, or

(iv) Have an *adverse financial effect* on the project.

*Id.* (emphasis added). "Minor violations" include paying rent late. *Id.* It is undisputed that respondents' late payments constituted repeated minor violations.

We find no cases or other authority, including the HUD Handbook, that address the scope of "adverse financial effect" as applied to HUD housing. We briefly touched on the issue in *Oak Glen*. In that case, the tenant paid her rent late on 17 occasions in five years and the landlord sought to evict her under the HUD regulation set out above. *Oak Glen*, 642

N.W.2d at 484. We concluded that the late payments constituted repeated minor violations, but declined to address whether the late payments had an adverse financial effect warranting eviction because the parties had not presented that issue to the district court. *Id.* at 486. As a result, the question of whether such administrative costs amount to an "adverse financial effect" is an issue of first impression.

Plainly read, the regulation is unqualified and contains no minimum amount necessary to constitute "adverse financial effect." Nor does the common definition of "adverse" imply a particular threshold. *See The American Heritage Dictionary* 26 (3d ed.1992) (defining "adverse," in part, as "[c]ontrary to one's interests or welfare; harmful or unfavorable"). Because there is no qualification or threshold, we interpret "adverse financial effect" to refer to all those effects that adversely impact the program. As a result, we conclude that the administrative costs resulting from preparing more than 70 late-rent and eviction notices create an adverse financial effect that is sufficient to meet the HUD standard. Several reasons compel us to adopt the plain meaning of the term.

■ First, this court construes words according to their common usage before resorting to interpretative devices. Minn. Stat. § 645.08(1) (2000); *Lucas v. Am. Family Mut. Ins. Co.,* 403 N.W.2d 646, 650–51 (Minn.1987). Because this regulation can be plainly read to encompass any and all adverse financial effect, we need not employ judicial construction to discern its meaning. *See Comm'r of Revenue v. Richardson,* 302 N.W.2d 23, 26 (Minn. 1981) ("No room for judicial construction exists when the statute speaks for itself.").

Second, the Minnesota Supreme Court has rejected our prior attempt to read equitable standards into HUD regulations when the regulation is carefully crafted and addresses all the concerns intended. *See Lor,* 591 N.W.2d at 703–04. In *Lor,* a HUD regulation gave public-housing authorities (PHAs) discretion to develop eviction policies that protect other tenants and the greater public while permitting managers to consider individual circumstances. *Id.* at 702–03. When Lor's landlord attempted to evict her for her son's violation of its policy, the trial court examined not only whether the policy had been violated, but also whether Lor could have known about the violation and whether Lor would suffer severe hardship if evicted. *Id.* at 702. We agreed with the trial court that it had discretion to look beyond the issue of whether the tenant violated the landlord's policies and consider the equitable circumstances surrounding the eviction. *Id.* The Minnesota Supreme Court reversed, holding that the HUD regulations plainly vest the PHAs, not the courts, with the authority to develop eviction standards. *Id.* at 703. The court reasoned that,

> [i]n light of HUD's careful crafting of the PHA role in eviction decisions, HUD would likely have spelled out any additional supervisory responsibilities it wished courts to take.

*Id.* at 704.

Likewise, the HUD eviction regulation here is detailed and thorough, and in fact defines other terms such as "drug-related criminal activity" and "material noncompliance." *See* 24 C.F.R. § 247.2 (2001). Thus, we must assume that HUD would have further defined "adverse financial effect" had it intended to impose a threshold financial requirement.

Finally, the United States Supreme Court also followed the plain meaning of a HUD-related statute when it was asked to read in a qualification in *Dep't of Hous. and Urban Dev. v. Rucker,* — U.S. —, ——, 122 S.Ct. 1230, 1233, 152 L.Ed.2d 258

(2002). In *Rucker*, a tenant asked the Court to read 42 U.S.C. § 1437d(*l*)(6) (1994 & Supp. V 1999), a HUD-related statute permitting eviction if any member or any guest of the tenant's household engaged in drug-related criminal activity, to mean that grounds for eviction existed only when the tenant had knowledge of the criminal activity. *Id.* at ——–——, 122 S.Ct. at 1232–33. The Court refused to qualify the provision with a "knowledge" requirement when Congress did not do so. *Id.* at ——, 122 S.Ct. at 1233. Similarly, the regulation here does not qualify the meaning of "adverse financial effect" and thus we must refrain from adopting anything but the plain meaning of the language.

Because the plain reading of the regulation contains no qualification or threshold for "adverse financial effect," the trial court erred when it failed to find that appellant's administrative costs meet the standard. The trial court's error is twofold. First, the trial court made no findings regarding appellant's administrative costs, despite ample evidence of the costs incurred. Howell's testimony regarding the time involved with filing more than 70 late-rent and eviction notices certainly satisfies any accepted meaning of "adverse financial effect." Second, the trial court premised its holding on the belief that appellant suffered no adverse financial effect because it recovered all the costs to which the law entitles it. But the HUD regulation is concerned with the costs incurred, not merely with the costs that go uncompensated. Thus, although a landlord may recover all the costs allowed under the law, it is possible, as happened here, that a landlord will suffer costs beyond those for which the law compensates it.

■ We decline to address respondents' arguments regarding redemption and es-toppel because those claims were not presented to the trial court. *See Thiele v. Stich,* 425 N.W.2d 580, 582 (Minn.1988) (stating that courts should decline to address issues not raised in the trial court). But we note that an estoppel defense does not apply where, as here, the landlord refuses to accept the final rent payment. *See Oak Glen,* 642 N.W.2d at 487 (stating that a landlord need only refuse the final payment to protect itself against a claim of waiver).

### DECISION

Because the administrative costs that appellant suffered from respondents' filing more than 70 late-rent and eviction notices constitute an "adverse financial effect," the trial court erred in dismissing appellant's eviction action.

**Reversed and remanded.**