Ronald W. KRONING, et al., Appellants,

v.

STATE FARM AUTOMOBILE
INSURANCE COMPANY,
et al., Respondents.

No. CX–95–2097.

Court of Appeals of Minnesota.

June 4, 1996.

Review Granted Aug. 6, 1996.

David J. Heuel, Rochester, for Appellants.

Lee L. LaBore, Hopkins, for Respondents.

Considered and decided by WILLIS, P.J., TOUSSAINT, C.J., and CRIPPEN, J.

## OPINION

CRIPPEN, Judge.

In an action against respondent State Farm Insurance for uninsured motorist benefits, appellant Ronald Kroning and his wife, appellant Theogene Kroning, challenge the denial of a new trial on numerous grounds but most pointedly on (a) the trial court's permission for use of collateral sources as evidence and (b) the trial court's suggestion to the jury that this evidence may have rendered unbelievable all of appellant Theogene Kroning's testimony.

## FACTS

On the morning of November 29, 1991, appellant Ronald Kroning left St. Charles, operating a fully loaded semi-tractor trailer in the course of his employment with St. Charles Transport. As he approached Chatfield, road conditions became ice-covered and extremely slippery. Appellant testified that he noticed a white car traveling in front of him, but was unaware of any other traffic. While ascending a hill where the highway passed through a stone cleft outside Chatfield, appellant testified that he was unexpectedly passed by a small red car, also proceeding west. Appellant testified that as the passing car cut in front of him, he observed the car's brake lights come on and then touched his own brakes. He testified that his truck's wheels then locked on the slippery pavement and his truck jack-knifed and collided with the rock wall on the cleft, coming to rest broadside across the highway, blocking both westbound and eastbound lanes. No accident witnesses were identified nor were the occupants of the white or red cars.

At the time of the accident, appellant was insured by an automobile policy issued by respondent that included uninsured motorist coverage, available if the driver of the car that allegedly passed appellant was deemed negligent. The determinative question at trial became whether the passing car described by appellant ever existed.

As a result of the accident, appellant sustained severe injuries, including a broken neck. At the time of trial, appellant was receiving permanent workers' compensation benefits and Social Security Disability income.

Appellant Theogene Kroning testified that while appellant was in the hospital immediately following the accident, he recounted the story of the passing car to her. At trial, appellant Theogene Kroning's testimony, recited below, was found to justify the introduction of collateral source evidence.

Q: ... When was it that your husband had recovered from his injuries to the point where you know him to be now?

A: Oh, when they took the halo off and after I ... a couple weeks later. We still had to work on pin sites, and his neck was stiff, and he had to go through all of this therapy. It took a couple of years.

Q: *Can you tell us or describe for us the kind of person your husband was before he was injured during 1991?*

A: *He was always laughing and joking and kidding around. He was a hard worker. He provided for us. He saw to all our needs.*

Q: What was his attitude toward working?

A: He loved to work. He was really working. He would be right at work. After work he would help friends work. He was always doing something. He was always active doing something. When we were in the business, the John Deere business, he would work until ... many times a farmer would call with a problem, he was there for them. He would answer their questions. He would go out to their farm to help them. Then when he was ... when we were no longer at this business, and he was working at the Ford dealership, customers would call him at all hours with questions, and he would answer them. He would help them. He would go help them try and work their problems out. He was always doing something.

Q: Before his injury, what were some of the services that he provided around your house?

A: Oh, he did everything around the house. He took care of the house. He maintained everything around the house. We didn't have to go hire it done or anything. He took care of it. He took care of any repairs that had to be made. If I had a piece of machinery that ... a wash machine that broke down, he could take it apart and fix it. He just did everything.

Q: Did you rely upon Ron for things other than household services?

A: Other than household services ... I relied on Ron for everything.

Q: What do you mean by that?

A: He was always there for me if I needed him. After I was ill, it was quite a period of time that I really needed support, and he was there for me. He always did everything. He always made sure that I got taken care of. When the family was home, he made sure the family got taken care of. When our grandchildren were around, he always played with the grandchildren.

Q: Since his injuries in this accident, Mrs. Kroning, what has your husband been able to contribute to the household services?

A: Nothing.

Q: Does he do any yard work?

A: Oh, that he does. He has a lawn tractor that he sits on, and he will cut the grass, but he can't go like he used to. He goes ... he used to go and cut the grass at a fairly fast rate of speed. Now he goes very slow, because if he goes too fast, his neck bothers him. When he comes in, he lays down. He has a sore neck and a bad headache.

Q: Since his injuries, has your husband been the same person upon whom you personally could rely upon for assistance?

A: No.

Q: How has that changed?

A: He can't fix anything anymore. He just really doesn't do anything around the house anymore that he did before.

A: *Has he worked for a wage anywhere since his accident?*

A: *No.*

Q: What is a typical day like now for your husband?

A: Well, he will get up, and he will have breakfast and go just read the paper, read a book, monkey around a little bit, not doing anything. And before you know it, he is laying down, because he has a bad headache or his head and neck is paining him. He spends a big part of his day in bed a lot or we have a recliner at home that he will sit in the recliner, and we will put a pillow in back of his head so that ... because he can't get his head to fit just right on the recliner. So a pillow goes back there. And he just sits and relaxes, and he is very ... he is in pain an awfully lot.

Q: How do you know that?

A: I can tell when he is in pain.

Q: How can you tell?

A: The way his attitude is.

Q: What do you mean?

A: He is really short. I can't do anything that is right. I can't pat his head, because it just disturbs him. He gets these pains in his head. One night he was sitting watching television, and he was holding and holding, and before you know it he was crying and ...

Q: Take your time, Mrs. Kroning.

A: And I asked him, and he said, "Oh, my fingers. I have got these shooting pains in my fingers again," and it didn't last for only five minutes. It lasted for quite a while that night.

Q: Had you ever known your husband to cry from pain he was feeling before the happening of this accident?

A: No.

Q: Was he one to complain a lot about his physical condition or about how he felt on any given occasion?

A: No.

Q: Does your husband get out of the house much these days?

A: Oh, we will get out once in a while in the afternoon and go downtown and have coffee with some of his friends.

Q: Downtown St. Charles?

A: Yes.

Q: Is that a fairly regular occurrence?

A: Oh, a couple of times a week he will do that now.

Q: Any other outings that he gets on of which you are aware?

A: Not with his friends anymore. It's just if he takes me someplace.

Q: What kind of places might he take you, Mrs. Kroning?

A: Oh, he will take me for groceries or we will go for a short ride on Sunday afternoon, go to church on Sunday morning.

Q: Does riding in a car affect your husband?

A: Yes, it does.

Q: In what way?

A: He gets severe headache and neck pain from it.

Q: How long can you typically go before he needs to stop?

A: A couple of hours, and then he has to get out.

Q: *As compared to before the happening of this accident in 1991, has your husband's outlook on life changed?*

A: Yes, it has.

Q: Can you explain that?

A: *Well, we looked so forward to our retirement years. We were going to travel. We were going to go see our son a lot. Our daughter isn't that all ... she isn't that far a drive, but we were going to be up there a lot. We were just even going to take and ... take and travel, not all the time, but enjoy ourselves.*

Q: *What do you foresee now?*

A: *I don't foresee any of that.*

Q: As compared to before the accident, has your husband's sense of humor changed?

A: Yes, it has.

Q: In what way?

A: He still has a slight sense of humor, but, oh, my, he had such a sense of humor. Now, he will try and joke, but before he was always full of jokes and always pulling pranks on me, always ... it was a lot of fun. It was a great life before this accident.

Predicated on this testimony, the trial court determined that appellant Theogene Kroning had claimed financial destitution, permitting the introduction of collateral source evidence pursuant to *Bartosch v. Lewison*, 413 N.W.2d 530, 533 (Minn.App.1987) ("The affirmative volunteering by [the plaintiff] of financial destitution caused by the accident justified the trial court's opening the door for cross-examination * * * "). Appellants contend that the testimony could not reasonably be read in that fashion and that the trial court abused its discretion by permitting the cross-examination of appellant Theogene Kroning on the topic of collateral sources.

Appellants also assert that the trial court erred in the instructions it gave to the jury while respondent's counsel was cross-examining appellant Theogene Kroning regarding collateral sources. First, in response to an objection by appellants' counsel, the trial court addressed the jury:

I am going to permit questions on this issue [collateral sources] for the very limited purpose * * * limited solely to the question of how it may bear upon her credibility or believability as a witness. * * * It's not to prove the third-party source, not to prove the amounts, solely as to whether you are going to believe her on this or any other subject.

A short while later, in response to another objection by appellants' counsel, the trial court told the jury:

Ladies and Gentlemen of the jury, before I rule, remember what I said a few moments ago. On direct examination this witness [Theogene Kroning] testified with respect to the future and her husband and her and their financial affairs. He [sic] is now being asked questions on that issue, their financial affairs in the future. Whether you want to call it social security or work

comp. is immaterial. I am allowing the testimony to go in for one purpose only. That purpose is as it attacks her credibility. She starts out with her direct testimony that they are looking forward to the future with no income in sight. It now develops that there may be some other income in sight, not what it is, not for whom it is, but it has an effect upon her credibility or her believability by you. * * *

After this statement by the court, appellants' counsel moved for a mistrial "on the basis of the court's comments to the jury." The trial court denied the motion without explanation, and the cross-examination of appellant Theogene Kroning continued.

### ISSUE

Did the trial court err by allowing in evidence of appellants' collateral sources?

### ANALYSIS

"Reversal for improper trial conduct is required only if the conduct constituted prejudicial error." *Miley v. Grabill,* 392 N.W.2d 52, 54 (Minn.App.1986). *See* Minn. R. Civ. P. 61 (harmless error does not require reversal). By statute, the court is not permitted to inform the jury "of collateral sources or any future benefits which may or may not be payable to the plaintiff." Minn.Stat. § 548.36, subd. 5 (1986);[1] *Bartosch v. Lewison,* 413 N.W.2d 530, 533 (Minn.App.1987).

1. Collateral Sources

■ Appellants argue the trial court erred in its admission and handling of collateral source issues during the cross-examination of appellant Theogene Kroning, thereby prejudicing appellants. Significantly, another trial judge who presided earlier in this case specifically ordered the suppression of "the use of and references to any documents purporting to be records of Plaintiff's claims for workers' compensation or social security benefits."

Relying on *Bartosch v. Lewison,* the trial court determined that it properly allowed cross-examination of appellant Theogene

Kroning as to her and her husband's collateral sources and correctly instructed the jury as to how they should treat the evidence of collateral sources.

In *Bartosch,* a plaintiff in a personal injury action arising out of an automobile accident moved in limine to exclude the introduction of evidence of her and her husband's present income, which was derived from Social Security Disability payments, interest income, real estate holdings, PIP wage loss benefits and private loss of income insurance benefits, a sum of income that was greater than the couple's income prior to the accident. 413 N.W.2d at 532. During trial, the plaintiff testified that her husband was severely disabled and dependent on her for support. Respondent's attorney argued that the plaintiff's statement conveyed the impression that she and her husband were in "dire financial straits" because plaintiff was no longer able to work as a result of the accident, thereby opening the door to evidence of plaintiff's present income. *Id.* at 533. Respondent's attorney claimed that evidence of present income from collateral sources was necessary to show that the reason plaintiff did not return to work was not because of the accident, but because her income was now sufficient, her health without the accident-related injury was poor, and her husband's life expectancy was limited due to a disabling heart condition. *Id.* This court held:

> Under these conditions, the collateral sources rule should not be used as a shield. The affirmative volunteering by [the plaintiff] of financial destitution caused by the accident justified the trial court's opening the door for cross-examination for the narrow purpose of testing the credibility of [the plaintiff's] assertion.

*Id.*

■ In the case before us, we conclude that the trial court's rulings regarding collateral sources were an abuse of discretion and reversible error. The testimony in this case does not tend to establish dire financial circumstances and is thereby distinguishable from *Bartosch.* In these circumstances, to permit superseding the collateral source stat-

---

**1.** The current version of Minn.Stat. § 548.36, subd. 5 is identical to the 1986 provision.

ute with its exceptions is to sacrifice the integrity of the statute and of the trial court's order in limine. Plaintiffs cannot be held to such a standard that at their first claim of any type of disadvantage they are susceptible to the introduction of collateral source evidence. It is for the unique situation where the statute is improperly used as a shield, as this court found in *Bartosch*, that the introduction of collateral source evidence should be allowed.

Moreover, appellant Theogene Kroning's testimony on the passing car was critical and the court invited the jury to believe that appellant Theogene Kroning could not be trusted in any of her testimony. The trial court's jury instructions are suggestive. They encourage prejudice on the matter of collateral sources and may constitute prejudice in and of themselves. *See Woodring v. United States,* 311 F.2d 417, 420–21 (8th Cir.1963) (implying prejudice where trial judge directly and impartially comments upon witnesses or testimony).

2. Other Issues

Appellants also claim the trial court committed reversible error by (1) refusing to suppress the testimony of a witness on grounds of unfair surprise, (2) denying jury requests for the rereading of certain testimony, (3) prohibiting appellants from offering specific rebuttal evidence, and (4) declining to admit statements appellant Ronald Kron-ing allegedly made to several third persons following the accident. Having thoroughly examined the record, we are not convinced that there was reversible error on these issues or such a contribution to cumulative error that a reversal on these grounds is required.

We realize that at the new trial some of these issues may arise once again. Nonetheless, we decline to attempt making a bright line ruling on the resolution of the issues but leave those determinations to be made in the trial court's discretion pursuant to the circumstances at retrial.

## DECISION

The trial court erred prejudicially by allowing the introduction of collateral source evidence in the absence of testimony by appellants asserting financial destitution. This error was compounded by the trial court's improper comments to the jury about the nature and effect of appellant Theogene Kroning's testimony.

**Reversed and remanded.**