Ronald W. KRONING, et al., Respondents,

v.

STATE FARM AUTOMOBILE INSURANCE COMPANY, et al., petitioners, Appellants.

No. CX–95–2097.

Supreme Court of Minnesota.

July 31, 1997.

William M. Hart, Katherine A. McBride, Meagher & Geer, P.L.L.P., Minneapolis, for appellants.

Daniel J. Heuel, Muir, Heuel, Carlson & Spelhaug, P.A., Rochester, for respondents.

Michael J. Ford, Dyan J. Ebert, Melinda M. Sanders, St. Cloud, amicus curiae.

## OPINION

BLATZ, Justice.

·This appeal arises out of an ·action for uninsured motorist benefits brought against appellants/defendants State Farm Automobile Insurance Company and State Farm Fire and Casualty Company (State Farm) by respondents/plaintiffs Ronald and Theogene Kroning (Kronings), as a result of a one-vehicle accident in which Mr. Kroning suffered severe physical injuries. At trial, after Mrs. Kroning testified, State Farm asserted that her testimony implied that the Kronings were financially destitute. Therefore, State Farm argued it was entitled to introduce evidence of collateral source payments[1] received by the Kronings to rebut the implication of destitution and to attack Mrs. Kroning's credibility. The trial court agreed with State Farm, concluding that Mrs. Kroning's testimony had opened the door to the admission of such evidence pursuant to *Bartosch v. Lewison,* 413 N.W.2d 530, 533 (Minn.App. 1987) ("The affirmative volunteering by [the plaintiff] of financial destitution caused by the accident justified the trial court's opening the door for cross-examination for the narrow purpose of testing the credibility of [the plaintiff's] assertion.").

The jury found that no uninsured vehicle was involved in Mr. Kroning's accident and, as a result, the trial court ordered judgment for State Farm. The court of appeals reversed and remanded for a new trial based on its conclusion that the trial court committed reversible error by permitting State Farm to introduce evidence of collateral source payments received by the Kronings and that the error was compounded by the trial court's instructions to the jury regarding the nature and effect of Mrs. Kroning's testimony. *Kroning v. State Farm Auto. Ins. Co.,* 549 N.W.2d 106, 110–11 (Minn.App. 1996). We affirm in part and reverse in part.

On November 29, 1991, Mr. Kroning was involved in a serious traffic accident while driving a semi-tractor trailer truck (semi) loaded with frozen meat. At the time of the accident, Mr. Kroning was driving west on Highway 74 near Chatfield, Minnesota. A mixture of snow and rain was falling, and temperatures were near freezing. According to Mr. Kroning, he was approaching a hill when a small red car passed him from behind in a no-passing zone. After the car went by, it pulled in between Mr. Kroning's semi and a white car in front of him. Mr. Kroning stated that the red car's brake lights came on, which caused him to apply his brakes. When he did so, his brakes locked, the semi went out of control, collided with a rock wall, and came to rest across both lanes of the highway. Neither the red nor the white car traveling ahead of Mr. Kroning stopped, and there were no known witnesses to the accident. Mr. Kroning was "very foggy" in the hours after the accident, and it was not until a month or two later that he began to understand what had happened.

Mrs. Kroning and her daughter testified that, at the hospital on the day of the accident, Mr. Kroning told them that a red car caused the accident. The accident report, prepared by the State Patrol shortly after the accident, however, indicated that Mr. Kroning could not remember how the accident occurred and contained no mention of a red car.

---

**1.** Collateral source payments are defined as:

> Subdivision 1. **Definition.** For purposes of this section, "collateral sources" means payments related to the injury or disability in question made to the plaintiff, or on the plaintiff's behalf up to the date of the verdict, by or pursuant to:
>
> (1) a federal, state, or local income disability or workers' compensation act; or other public program providing medical expenses, disability payments, or similar benefits;

Minn.Stat. § 548.36 (1996).

As a result of the accident, Mr. Kroning suffered severe injuries, including a broken neck, and has been unable to work. During his direct examination, Mr. Kroning testified about his wages before and after the accident. He talked about how the couple was draining their retirement fund because he had not been able to work. He explained: "[I]nstead of starting your retirement at 65 and having it bigger at that time, I started it at 57, and so it has been depleting since then."

After Mr. Kroning testified, his wife took the stand. Mrs. Kroning's testimony was emotional and marked by tears, and she was offered time by the court to compose herself. In response to various questions, Mrs. Kroning, like her husband, offered testimony of financial problems. Mrs. Kroning testified that prior to the accident, her husband "was a hard worker. He provided for us. He saw to all our needs." She also testified that she "relied on [him] for everything" and that her husband "always made sure that [she] got taken care of." In response to a question regarding a change in her husband's outlook, Mrs. Kroning testified that prior to his accident, they had looked forward to their retirement years with plans to "enjoy" themselves and travel. Now, she did not "foresee any of that."

State Farm argued to the trial court that it was entitled to introduce evidence of collateral source payments received by the Kronings because Mrs. Kroning's testimony was highly prejudicial and conveyed to the jury that the accident had such a severe financial impact that the Kronings were "in dire financial straights [sic]." The trial court agreed and allowed State Farm to introduce evidence of collateral source payments received by the Kronings. In allowing the collateral source evidence, the trial court instructed the jury:

I am going to permit questions on this issue [collateral source payments] for the very limited purpose * * * limited solely to the question of how it may bear upon her credibility or believability as a witness. * * * It's not to prove the third-party source, not to prove the amounts, solely as to whether you are going to believe her on this or any other subject.

In response to the Kronings' objection to that instruction, the trial court further instructed the jury:

On direct examination this witness [Mrs. Kroning] testified with respect to the future and her husband and her and their financial affairs. He [sic] is now being asked questions on that issue, their financial affairs in the future. Whether you want to call it social security or work comp. is immaterial. I am allowing that testimony to go in for one purpose only. That purpose is as it attacks her credibility. She starts out with her direct testimony that they are looking forward to the future with no income in sight. It now develops that there may be some other income in sight, not what it is, not for whom it is, but it has an effect upon her creditability [sic] or her believability by you.

Based on this second instruction, the Kronings moved for a mistrial, claiming that the instruction "completely poisoned the jury." That motion was denied.

The jury, while finding that the Kronings were damaged in the amount of $498,908, also found that the red car, which the Kronings claimed triggered the accident, did not exist. As a result, the trial court ordered judgment for State Farm because the Kronings failed to establish an essential element for entitlement to uninsured motorist benefits. The Kronings moved for judgment notwithstanding the verdict or, in the alternative, a new trial. Both motions were denied. In their appeal to the court of appeals, the Kronings argued that the trial court erred in admitting evidence of collateral source payments received by the Kronings because Mrs. Kroning's testimony did not open the door for the admission of such evidence and that the trial court's jury instructions with respect to the admission of the collateral source evidence were improper and prejudicial. The court of appeals agreed with the Kronings and reversed.

■ The admission of "evidence rests within the broad discretion of the trial court and its ruling will not be disturbed unless it is based on an erroneous view of the law or

constitutes an abuse of discretion." *Uselman v. Uselman*, 464 N.W.2d 130, 138 (Minn. 1990). "Entitlement to a new trial on the grounds of improper evidentiary rulings rests upon the complaining party's ability to demonstrate prejudicial error." *Id.* In the absence of some indication that the trial court exercised its discretion arbitrarily, capriciously, or contrary to legal usage, the appellate court is bound by the result. *Plunkett v. Lampert*, 231 Minn. 484, 492, 43 N.W.2d 489, 494 (1950).

In 1986, the legislature enacted Minn.Stat. § 548.36, subd. 5, which specifically provides that "[t]he jury shall not be informed of the existence of collateral sources [of income] or any future benefits which may or may not be payable to the plaintiff." While this statute sets forth a general rule barring collateral source evidence, the Minnesota Rules of Evidence allow impeachment of a witness. *See* Minn. R. Evid. 607. In *Bartosch v. Lewison*, the court of appeals recognized this exception and held that cross-examination on collateral source evidence for the limited purpose of testing credibility is permissible when a plaintiff volunteers evidence of financial destitution as a result of a tortfeasor's actions. 413 N.W.2d 530, 533 (Minn.App.1987).

In *Bartosch*, Mrs. Bartosch testified that her husband, who was severely disabled, was dependent on her for support and that she could no longer work because of the accident, thereby conveying an impression that she and her husband were financially destitute. *Id.* The trial court permitted cross-examination on collateral benefits. The court of appeals affirmed, noting that "the collateral sources rule should not be used as a shield" and holding that the affirmative volunteering by Mrs. Bartosch of financial destitution justified the trial court's decision to permit cross-examination on collateral benefits. *Id.*

We believe that the *Bartosch* decision was correct. We therefore hold that when a plaintiff, through either the use of misleading statements or outright false statements, falsely conveys to the jury that he or she is destitute or in dire financial straits, the admission of evidence of collateral source payments received by the plaintiff is permitted. We note that when a party "offers evidence that certain conditions exist, he cannot complain that the court permits his evidence to be rebutted." *Wright v. Engelbert*, 193 Minn. 509, 512–13, 259 N.W. 75, 77 (1935) (citation and internal quotation marks omitted). The question that remains to be answered is whether the court of appeals properly applied *Bartosch* to the facts of this case.

Both Mr. and Mrs. Kroning offered evidence of financial problems. Mr. Kroning first complained about the draining of the family retirement fund because he could no longer work. Then came Mrs. Kroning's intensely emotional testimony.[2] She told of how, since the accident, her husband provided none of the household services and could no longer provide for the family.

The trial court was in the best position to determine whether Mrs. Kroning's words, coupled with her tears and other nonverbal cues, gave the jury the impression the couple was suffering financial destitution because of her husband's accident. *See Maxfield v. Maxfield*, 452 N.W.2d 219, 226 (Minn.1990) (noting that the trial court is in the best position to judge credibility of witnesses). In deciding whether impeachment evidence is necessitated by evidence already admitted into trial, it is the trial court's responsibility to exercise its discretion wisely and, in doing so, to further serve the truth-seeking process and to serve the ends of justice. The majority recognizes that a trial is more than a dry transcript and concludes that when the record is taken as a whole, sufficient evidence exists to support the trial court's ruling regarding the admission of impeachment evidence. We therefore hold that the trial court

---

**2.** When State Farm moved to allow cross-examination of Mrs. Kroning on collateral sources, State Farm's counsel noted that:

[Mrs. Kroning] was crying consistently on the stand. Counsel was very gentle with her * * * her counsel * * * he didn't ask her questions that I thought would be that disturbing and yet she was in constant tears for over an hour on the stand. And I want the record to reflect that, because it goes to what I'm going to be moving the court to be allowed to do.

This statement was not refuted or corrected by opposing counsel or the trial court.

did not abuse its discretion by permitting cross-examination of Mrs. Kroning on collateral source benefits. This court's affirmance is not an evisceration of the collateral source rule as stated in the dissent. Rather, it is a clear recognition that a trial court judge is more capable of evaluating the impact of a witness's testimony than a reviewing tribunal. As human experience has taught us, words alone rarely communicate the entire message.

■ Further, we believe that the dissent strikes an imbalance between the collateral source rule and Minnesota Rules of Evidence 607, essentially according a plaintiff's testimony in a civil case a level of protection not even accorded a defendant's testimony in criminal trials. The collateral source statute does not trump the Minnesota Rules of Evidence allowing impeachment. In this case, albeit civil, the dissent chooses to second guess the trial court's conclusion that Mrs. Kroning, building on her husband's testimony, had communicated to the jury a false impression of their financial condition.[3] While a trial court's discretion is not unbridled, the exercise of it is more of an art than a science. In this case, a different trial court may have reached a different decision, but this is not the standard upon which a trial court's decision is reviewed. The issue is whether the trial court exercised its discretion arbitrarily or capriciously. *See Plunkett*, 231 Minn. at 492, 43 N.W.2d at 494. Clearly, the record here lends sufficient support to the trial court's decision to allow cross-examination on collateral source benefits.

■ We next turn our attention to the Kronings' claim that the trial court committed prejudicial error when it instructed the jury on two occasions as to the reasons why the collateral source payment evidence was being admitted. *See supra*, 45–46. The Kronings challenge both of the trial court's instructions. The court of appeals concluded

that the instructions invited the jury not to trust any of Mrs. Kroning's testimony, that the instructions were suggestive, and that they encouraged prejudice toward the Kronings in the minds of the jurors. *Kroning*, 549 N.W.2d at 111.

■ A trial court must not invade the province of the jury by making comments, insinuations, or suggestions indicative of the court's view of the integrity or credibility of witnesses. *State v. Garden*, 267 Minn. 97, 113, 125 N.W.2d 591, 601 (1963). "The influence of the trial judge on the jury is necessarily and properly of great weight and [the] lightest word or intimation is received with deference, and may prove controlling." *State v. Shetsky*, 229 Minn. 566, 569–70, 40 N.W.2d 337, 339 (1949) (internal quotation marks omitted) (quoting *Quercia v. United States*, 289 U.S. 466, 470, 53 S.Ct. 698, 699, 77 L.Ed. 1321 (1933) (stating that it is prejudicial error for the trial court to comment unfavorably on a witness)). When the key issue at trial is the credibility of a witness, the trial court must exercise care to maintain its neutrality in instructing the jury. When the trial court interjects its own beliefs with regard to credibility, the likely effect upon the average juror is that the "witness [is] thoroughly discredited, and any value that [the witness's] testimony might otherwise have had [is] greatly impaired, if not wholly destroyed * * *." *Id.* at 571, 40 N.W.2d at 340 (quoting *State v. Hanson*, 173 Minn. 158, 161, 217 N.W. 146, 147 (1927) (stating that to preserve the integrity of a jury trial, the credibility of witnesses should be left entirely to the jury)).

■ A trial court's statement upon a pivotal fact, which might have an important bearing on the jury's evaluation of the evidence, is grounds for a new trial. *Cf. Adelmann v. Elk River Lumber Co.*, 242 Minn. 388, 392, 65 N.W.2d 661, 665 (1954); *Larkin v. City of Minneapolis*, 112 Minn. 311, 315,

---

**3.** In determining the propriety of impeachment on collateral source benefits, our analysis does not turn solely on the truthfulness or falsity of individual statements made by a witness. Rather, the key is whether the witness's testimony, in its entirety, conveyed a false impression of financial destitution. We note that in *Bartosch*, Mrs.

Bartosch was reciting facts when she testified that her husband, who suffered from heart disease, was severely disabled and dependent on her for support. 413 N.W.2d at 533. In fact, Mr. Bartosch died sometime prior to the time of the appeal. *Id.*

127 N.W. 1129, 1130 (1910). Before a new trial may be ordered on such grounds, it must be shown that the improper instructions resulted in prejudice. *United States v. Carter*, 528 F.2d 844, 851 (8th Cir.1975). In determining whether the trial court's improper instructions resulted in prejudice, we must construe the instructions as a whole from the standpoint of the total impact on the jury. *Lindstrom v. Yellow Taxi Co.*, 298 Minn. 224, 229, 214 N.W.2d 672, 676 (1974).

A pivotal question to be resolved in this case was the existence of the red car that the Kronings claim caused the accident. Mrs. Kroning's testimony, particularly her testimony with respect to the red car, was key to answering this question. Anything casting doubt on her credibility had great potential to sway the jury, and while it was proper for State Farm to attack her credibility, it was improper for the court to do so. The instructions, as given, were such that they could only have had the effect of discrediting Mrs. Kroning and impairing the value of her testimony. Thus, we conclude that the Kronings were prejudiced by the instructions.

Because we hold that the trial court did not abuse its discretion by permitting the introduction of collateral source payment evidence and that the jury instructions related to that evidence, viewed in their entirety, were prejudicial, we affirm the court of appeals in part and reverse in part. The case is remanded for a new trial.

Affirmed in part and reversed in part.

PAGE, Justice (concurring in part, dissenting in part).

Today, the court adopts the exception to the collateral source rule set out by the court of appeals in *Bartosch v. Lewison*,[1] 413 N.W.2d 530 (Minn.App.1987), and holds that a defendant may rebut a plaintiff's claim of financial destitution by presenting evidence of collateral source payments received by the plaintiff. I agree with the court's decision to adopt the *Bartosch* exception to prevent plaintiffs from misleading or lying to the jury with respect to claims of financial destitution.[2] I believe, however, that the court's application of this exception to the facts in the record in this case is wrong. Therefore, I strongly disagree with the court's conclusion that the trial court here did not abuse its discretion when it allowed State Farm to introduce at trial evidence of payments the Kronings received from collateral sources. The court's decision eviscerates the collateral source rule as set forth in Minn.Stat. § 548.36 (1996 & Supp.1997).[3] If Mrs. Kron-

1. In *Bartosch*, the plaintiff, who had been injured in an automobile accident, asserted that she was unable to work because her health was so poor as a result of the accident. *Id.* at 533. However, there was evidence on the record that she did not, in fact, suffer disabling injuries as a result of the accident, but had actually chosen not to return to work because her post-accident income from other sources was greater than what she earned from work prior to the accident. *Id.* at 532–33. The court of appeals concluded that the plaintiff, by asserting that she was unable to work because of the accident, was trying to mislead the jury and was not being truthful and therefore held that the defendant was entitled to introduce at trial evidence of collateral source payments received by the plaintiff. *Id.* at 533.

2. I also agree with the court's conclusion that the trial court committed prejudicial error when it instructed the jury on the purpose for admitting the evidence of collateral source payments.

3. **548.36. COLLATERAL SOURCE CALCULATIONS.**
   Subdivision 1. **Definition.** For purposes of this section, "collateral sources" means pay-ments related to the injury or disability in question made to the plaintiff, or on the plaintiff's behalf up to the date of the verdict, by or pursuant to:
   (1) a federal, state, or local income disability or workers' compensation act; or other public program providing medical expenses, disability payments, or similar benefits;
   (2) health, accident and sickness, or automobile accident insurance or liability insurance that provides health benefits or income disability coverage; except life insurance benefits available to the plaintiff, whether purchased by the plaintiff or provided by others, payments made pursuant to the United States Social Security Act, or pension payments;
   (3) a contract or agreement of a group, organization, partnership, or corporation to provide, pay for, or reimburse the costs of hospital, medical, dental or other health care services; or
   (4) a contractual or voluntary wage continuation plan provided by employers or any other system intended to provide wages during a period of disability, except benefits received from a private disability insurance policy where the premiums were wholly paid for by the plaintiff.

ing's testimony regarding the circumstances surrounding the accident and the damages she and her husband suffered as a result of the accident opens the door for the admission of evidence of collateral source payments, then, by the court's decision today, the door will never be closed. Indeed, on the record before us, the court's decision allows the exception to swallow the rule.

As I understand it, the intent of the exception adopted by the court is to prevent prejudice to a defendant that could result from false or misleading claims by a plaintiff that the plaintiff either is or will be "destitute" or in "dire financial straits" as a result of the complained of accident. *See Bartosch,* 413 N.W.2d at 533. Thus, where a plaintiff makes false or misleading statements as to his or her financial condition, the door should be open for the defendant to introduce evidence of collateral source payments to rebut those statements. Therefore, in order for the court to have concluded that the trial court did not abuse its discretion in this case, the court had to conclude that Mrs. Kroning's testimony was either false or mislead-

ing.[4] However, there is no evidence in this record that she either lied to or misled the jury.

To put the collateral source rule in context, a brief discussion of its history and purpose is necessary. The collateral source rule has been accepted by courts in the United States since 1854. James L. Branton, *The Collateral Source Rule,* 18 St. Mary's L.J. 883, 883 (1987) [hereinafter "Branton"]. The common law rule came into existence to assist in determining an injured party's damages by addressing the tension between the injured party and the tortfeasor when the injured party receives payments from a third party (the collateral source) unrelated to and unconnected with the tortfeasor.[5] This tension exists because if evidence of payments from collateral sources is admitted at trial, it is possible that the tortfeasor could benefit from the plaintiff's receipt of payments from collateral sources that cover some portion of the plaintiff's damages. *Id.* at 884; *see also Grayson v. Williams,* 256 F.2d 61, 65 (10th Cir.1958) ("No reason in law, equity or good

Subd. 2. **Motion.** In a civil action, whether based on contract or tort, when liability is admitted or is determined by the trier of fact, and when damages include an award to compensate the plaintiff for losses available to the date of the verdict by collateral sources, a party may file a motion within ten days of the date of entry of the verdict requesting determination of collateral sources. If the motion is filed, the parties shall submit written evidence of, and the court shall determine:

(1) amounts of collateral sources that have been paid for the benefit of the plaintiff or are otherwise available to the plaintiff as a result of losses except those for which a subrogation right has been asserted; and

(2) amounts that have been paid, contributed, or forfeited by, or on behalf of, the plaintiff or members of the plaintiff's immediate family for the two-year period immediately before the accrual of the action to secure the right to a collateral source benefit that the plaintiff is receiving as a result of losses.

Subd. 3. **Duties of the court.** (a) The court shall reduce the award by the amounts determined under subdivision 2, clause (1), and offset any reduction in the award by the amounts determined under subdivision 2, clause (2).

(b) If the court cannot determine the amounts specified in paragraph (a) from the written evidence submitted, the court may within ten days request additional written evidence or schedule a conference with the parties to obtain further evidence.

(c) In any case where the claimant is found to be at fault under section 604.01, the reduction required under paragraph (a) must be made before the claimant's damages are reduced under section 604.01, subdivision 1.

Subd. 4. **Calculation of attorneys' fees.** If the fees for legal services provided to the plaintiff are based on a percentage of the amount of money awarded to the plaintiff, the percentage must be based on the amount of the award as adjusted under subdivision 3. Any subrogated provider of a collateral source not separately represented by counsel shall pay the same percentage of attorneys' fees as paid by the plaintiff and shall pay its proportionate share of the costs.

Subd 5. **Jury not informed of collateral sources.** The jury shall not be informed of the existence of collateral sources or any future benefits which may or may not be payable to the plaintiff.

4. If, as it appears from the court's opinion, the court failed to conclude that any statements attributable to Mrs. Kroning were false or misleading, discussion of the admission of evidence of collateral source payments should have ended there. If the plaintiff makes no false or misleading statements, there is no basis to apply the exception to the collateral source rule.

5. Examples of such payments include third-party payment of workers' compensation benefits, health care benefits, and disability benefits.

conscience can be advanced why a wrongdoer should benefit from part payment from a collateral source of damages caused by his wrongful act.") Conversely, if evidence of the payments is not admitted, the plaintiff may receive a double recovery. *Imlay v. City of Lake Crystal*, 453 N.W.2d 326, 331 (Minn.1990). The collateral source rule evolved to protect the interests of the injured party. In part, this was because the damages received by injured parties tend not to fully compensate the victim. *Hudson v. Lazarus*, 217 F.2d 344, 346 (D.C.Cir.1954). In evolving to protect the interests of the injured party, the collateral source rule became both a rule of evidence and a rule of damages. Branton at 883. As a rule of evidence, it precluded the defendant from introducing evidence that some of the plaintiff's damages had been paid by a collateral source. *Id.* As a rule of damages, it precluded the defendant from offsetting the judgment against any receipt of collateral source income by the plaintiff. *Id.*

The common law rule, as it existed in Minnesota, prohibited the admission, at trial, of evidence of collateral source payments received by the plaintiff and was applied by this court in a variety of situations. *See Hueper v. Goodrich*, 314 N.W.2d 828, 831 (Minn.1982) (allowing recovery of medical expenses from the tortfeasor despite the fact that the expenses were donated by a third party); *see also Hubbard Broadcasting, Inc. v. Loescher*, 291 N.W.2d 216, 222 (1980) (holding that compensation received from a third party will not diminish recovery against a wrongdoer and that the purpose of the collateral source rule is punitive); *Van Tassel v. Horace Mann Ins. Co.*, 296 Minn. 181, 188–89, 207 N.W.2d 348, 352–53 (1973) (concluding that insurance paid for by plaintiff should not benefit tortfeasor); *Local 1140, Int'l Union of Elec., Radio & Mach. Workers v. Massachusetts Mut. Life Ins. Co.*, 282 Minn. 455, 458–59, 165 N.W.2d 234, 236 (1969) (holding that benefit of reimbursement by hospital when blood was replaced by donor group to which injured plaintiffs belonged goes to plaintiffs). By statute the

legislature changed the common law rule in 1986. *See* Minn.Stat. § 548.36. Under the statute, evidence of payments received from collateral sources is not admissible at trial and the jury may not be informed of those payments or of any future payments from collateral sources which may be payable to the plaintiff. *Id.* at subd. 5. However, the defendant may, after completion of the trial, make a motion to the court seeking a determination of the amount of collateral source payments received by the plaintiff. *Id.* at subd. 2. Once that amount is determined, the court is required to reduce the verdict by that amount. *Id.; see also* Charles E. Spevacek, *Tort Reform in Minnesota—The Impact of the 1986 Legislative Enactments on General Civil Litigation*, 10 Hamline L.Rev. 461, 462–63 (1987). The statute's purpose is to prevent plaintiffs from receiving windfall recoveries at the expense of defendants. *Imlay*, 453 N.W.2d at 331. This court has upheld Minn.Stat. § 548.36 on a number of occasions. *See, e.g., Western Nat. Mut. Ins. Co. v. Casper*, 549 N.W.2d 914, 916–18 (Minn. 1996) (refusing to overrule or modify the legislature's adoption of the collateral source statute); *Dean v. American Family Mut. Ins. Co.*, 535 N.W.2d 342, 344–45 (Minn.1995) (upholding the statute, but concluding that the court of appeals misapplied it to the facts of the case before it); *Imlay*, 453 N.W.2d at 331–32 (upholding the collateral source statute and finding that it does not violate constitutional equal protection guarantees); *Johnson v. Consolidated Freightways, · Inc.*, 420 N.W.2d 608, 614 (Minn.1988) (upholding the statute and discussing its purposes).

State Farm contends that Mr. and Mrs. Kroning's testimony was calculated to engender sympathy from the jury by giving the impression that they were destitute [6] and, as a result, opened the door to cross-examination on payments they had received from collateral sources. Specifically, State Farm claims that Mrs. Kroning, while crying uncontrollably, testified that, before the accident, Mr. Kroning "provided for us," "saw to all our needs," that he had not "worked for a

---

**6.** The American Heritage Dictionary define "destitute" as "[u]tterly impoverished." American Heritage Dictionary 387 (2d College ed.1982).

"Destitution" is defined as "[e]xtreme want of resources or the means of subsistence; complete poverty." · *Id.*

wage anywhere" since the accident, and that she did not foresee the type of retirement for which they had planned. Based on that testimony, State Farm contends that the Kronings were claiming that they were destitute and, in doing so, opened the door for the admission of evidence of collateral source payments.

The court concludes that the "trial court was in the best position to determine whether Mrs. Kroning's words, coupled with her tears and other non-verbal cues gave the jury the impression the couple was suffering financial destitution," *ante* at 46, and by implication that the record supports State Farm's contention, and, therefore, the trial court did not abuse its discretion.[7] In reaching these conclusions, the court has focused on the "impression" Mrs. Kroning's testimony gave the jury. That, however, is the wrong focus. The question the court ought to be focused on is whether Mrs. Kroning lied to or misled the jury.

In fact, Mrs. Kroning's testimony belies the court's conclusions. The relevant testimony leading to the trial court's decision to admit the evidence of collateral source payments is as follows:

Q: Now, Mrs. Kroning, you can either refer to that exhibit or set it aside. The question I guess I'd like to ask you at this point in time is whether you can describe for us and the jury generally what was involved in Ron's everyday care.

A: Well, after I get him up and get him breakfast, I would feed him, and we would get to the bathroom, and I would wash him. I would help him get dressed. And I would clean his pin sites. And there were times ... quite a few times I would wash his head.

Q: Well, let me stop you right there, if I could, because you mentioned this a

couple of times. Can you describe what was involved in getting Ron in and out of bed?

A: I would have to raise the hospital bed to a sitting position and grab a hold of his legs and swing him out. And then I would grab a hold of these ... I always call them bars ... what are they, the up and down for the halo ... I grab a hold of them and would lean ... and pull him, and he would try and reach around me for support to get out of bed.

Q: What was involved in turning him when he was in the bed?

A: I would have to take him ... according to the side he would want to go on, I would have to take and shove up his side, grab a hold of these bars, take as hard as I could and shove the other side to try and get him comfortable ... try and get him so that he could lay half way decent so that he wouldn't be at a funny angle laying.

Q: Was he able to assist you in any of these maneuvers?

A: No, not turning.

Q: What was involved ... well, I guess you have told us about cleaning and disinfecting the pin sites. What was involved in bathing and dressing him?

A: Just everything. I would have to wash him all up.

Q: Well, could he take ... could he get in the tub? Could he get in the shower?

A: Oh, no, I had to sponge bathe him, and he could not dress himself. He could not bend. He could not raise his arm higher than the cast was ... the vest I should say.

Q: How did you go about dressing him then?

A: Well, he would sit down, and I would put his underclothes on and then pull

7. In reaching this conclusion, the court points to Mr. Kroning's testimony to support its conclusion that Mrs. Kroning was claiming they suffered financial destitution. In doing so, the court overlooks the fact that State Farm did not, at the time of trial, object to any of Mr. Kroning's testimony or seek to introduce evidence of collateral source payments based on his testimony. While Mr. Kroning's testimony may or may not have opened the door for the introduction of collateral source evidence, that issue was not decided by the court of appeals and is not before this court. The issue raised by State Farm's petition for further review is solely whether Mrs. Kroning's testimony opened the door.

Q: him to a standing position. I would slide them over his feet. Well, I would get the underclothes and the pants slid on, put it that way, first, so that when I got him to a standing position, I could pull everything up and get that done. And then I could put his shirt on.

Q: Did you have to alter his clothing to fit him?

A: Yes.

Q: You have mentioned assistance he needed in eating, drinking, taking medications. What did you have to do for him in those circumstances?

A: I did everything. I had to get the water. I had to get his pills. In eating, I had to feed him. When he tried to use his left hand in eating, because he wanted to try and do something, he couldn't bend to look at the table to see the plate. So I had one of these bed trays you put over your lap for in bed if you are sick, and I would set that on the table and set his plate on there. Then I would cut up his food, that is his meat and anything that needed to be cut up, because he only had one hand to use ... I'm showing you that ... it was his left hand. And he was not left-handed. Since that is ... and then for drinking, he could not tip his head to go like that, so I would put a straw in a glass so that he could drink.

Q: You have talked about bathing Ron. What was involved in washing his hair?

A: I would have to get him down on his knees in the bathroom in front of the tub, and he could not bend down so he would be over the tub, and then I would pour water on his head and shampoo it and then rinse it, and then dry as best I could.

Q: Did he comb his hair?

A: No.

Q: Who did that?

A: I did.

Q: Did he shave himself?

A: Oh, no.

Q: Did you assist in that?

A: I tried. I would hit him with the razor accidentally, not that ... all I would have to do is just tap it, and it would hurt.

Q: Tap what, Mrs. Kroning?

A: These bars that ... what do you call them again ... the bars.

Q: The bars is fine.

A: I would tap these bars, just lightly tapped it with the razor, and it would send ... give him a terrific headache.

Q: How do you know that?

A: He would tell me his head was hurting him so. He would say, "Please don't do that anymore." I would say, "I can't help it." So then we decided that he grow a beard.

Q: Was he able to attend to his bathroom needs by himself?

A: No, he wasn't.

Q: Did you assist him to and from the toilet?

A: Yes, I did.

Q: Are you okay?

A: Yes.

Q: How was your husband's physical condition during this period of time? I mean how did he ... did he speak to you of discomfort for example?

A: Yes.

Q: What was he saying?

A: He had terrific headaches. His neck would hurt. He was just so uncomfortable.

Q: Was he going to doctor's appointments from time to time?

A: Yes, he was.

Q: And where were those appointments?

A: At St. Marys Hospital.

Q: Back here in Rochester?

A: Yes.

Q: How did he get back and forth to the doctor's appointments?

A: I took him.

Q: Who drove the car?

A: I did.

Q: Who helped him in and out of the vehicle?

A: There were attendants at the door at St. Marys that would help him, and at home I would do my best to help him.

Q: Anyone else to assist you on those occasions?

A: No.

Q: Other than for doctor's appointments, did your husband leave the house for any other reason?

A: We went once to see my father who died in the hospital.

Q: Any other excursions or outings, Mrs. Kroning?

A: No, just to St. Marys in Rochester.

Q: Did Ron leave the house for any reason at all, take a walk, anything along those lines?

A: No.

Q: What would he do during the day?

A: He would lay and sit, and he couldn't sit too long, and then he would be back in bed. He couldn't lay too long, and then he would be up in the chair again and try and sit. That's all he could do.

Q: Was the halo vest itself comfortable for him?

A: No, it wasn't.

Q: In what way was it not?

A: Oh, the pins hurt, and the vest itself, I remember he broke out with a rash inside, and it itched so bad that I put powder down, and I tried to get powder down the front and tried to get ... I would take out a rag and push it down as gently as I could with a ruler, a yardstick, so that I wouldn't hurt him. It would be a long rag, and I would pull it up and down to try to scratch his back, and then I would take it out and apply the powder.

Q: How frequently did you do that?

A: Oh, I did that a couple times a day.

Q: Did this routine, if I can call it that, did this type of life that you have described for us, did this change in any material way before March 3rd of

1992 when he had the cast removed? Did you follow my question?

A: No, I didn't.

Q: I'll ask it again. Did the routine that you have just described for us, did this change in any material fashion during this approximately three months?

A: No, it didn't.

Q: Was Ron ever able to get the vest off himself for example?

A: No, he wasn't.

Q: From your experience living with your husband during that period of time, could he have performed any of these daily activities that we have been talking about without your assistance?

A: No.

Q: Were you there for him 24 hours a day?

A: Yes, I was.

Q: Did you ever yourself ever take a vacation or leave him in the care of any other person?

A: No, I didn't.

Q: Now, of course there has been a period of recovery and convalescence that your husband has been through. Looking at him in the condition that you know him to be in today, Mrs. Kroning, when would it be when ... by date ... when you are satisfied that he was in the same condition that you find him now?

A: I didn't follow that. I'm sorry.

Q: It was a bad question. Let me try to ask it again. When was it that your husband had recovered from his injuries to the point where you know him to be now?

A: Oh, when they took the halo off and after I ... a couple weeks later. We still had to work on pin sites, and his neck was stiff, and he had to go through all of this therapy. It took a couple of years.

Q: *Can you tell us or describe for us the kind of person your husband was before he was injured during 1991?*

A: *He was always laughing and joking and kidding around. He was a hard*

*worker. He provided for us. He saw to all our needs.*

Q: What was his attitude toward working?

A: He loved to work. He was really working. He would be right at work. After work he would help friends work. He was always doing something. He was always active doing something. When we were in the business, the John Deere business, he would work until ... many times a farmer would call with a problem, he was there for them. He would answer their questions. He would go out to their farm to help them. Then when he was ... when we were no longer at this business, and he was working at the Ford dealership, customers would call him at all hours with questions, and he would answer them. He would help them. He would go help them try and work their problems out. He was always doing something.

Q: Before his injury, what were some of the services that he provided around your house?

A: Oh, he did everything around the house. He took care of the house. He maintained everything around the house. We didn't have to go hire it done or anything. He took care of it. He took care of any repairs that had to be made. If I had a piece of machinery that ... a wash machine that broke down, he could take it apart and fix it. He just did everything.

Q: Did you rely upon Ron for things other than household services?

A: Other than household services ... I relied on Ron for everything.

Q: What do you mean by that?

A: He was always there for me if I needed him. After I was ill, it was quite a period of time that I really needed support, and he was there for me. He always did everything. He always made sure that I got taken care of. When the family was home, he made sure the family gotten taken care of. When our grandchildren were around,

he always played with the grandchildren.

Q: Since his injuries in this accident, Mrs. Kroning, what has your husband been able to contribute to the household services?

A: Nothing.

Q: Does he do any yard work?

A: Oh, that he does. He has a lawn tractor that he sits on, and he will cut the grass, but he can't go like he used to. He goes ... he used to go and cut the grass at a fairly fast rate of speed. Now he goes very slow, because if he goes too fast, his neck bothers him. When he comes in, he lays down. He has a sore neck and a bad headache.

Q: Since his injuries, has your husband been the same person upon whom you personally could rely upon for assistance?

A: No.

Q: How has that changed?

A: He can't fix anything anymore. He just really doesn't do anything around the house anymore that he did before.

Q: *Has he worked for a wage anywhere since his accident?*

A: *No.*

Q: What is a typical day like now for your husband?

A: Well, he will get up, and he will have breakfast and go just read the paper, read a book, monkey around a little bit, not doing anything. And before you know it, he is laying down, because he has a bad headache or his head and neck is paining him. He spends a big part of his day in bed a lot or we have a recliner at home that he will sit in the recliner, and we will put a pillow in back of his head so that ... because he can't get his head to fit just right on the recliner. So a pillow goes back there. And he just sits and relaxes, and he is very ... he is in pain an awfully lot.

Q: How do you know that?

A: I can tell when he is in pain.

Q: How do you tell?

A: The way his attitude is.

Q: What do you mean?

A: He is really short. I can't do anything that is right. I can't pat his head because it just disturbs him. He gets these pains in his head. One night he was sitting watching television, and he was holding and holding, and before you know it he was crying and ...

Q: Take your time, Mrs. Kroning.

A: And I asked him, and he said, "Oh, my fingers. I have got these shooting pains in my fingers again," and it didn't last for only five minutes. It lasted for quite a while that night.

Q: Had you ever known your husband to cry from pain he was feeling before the happening of this accident?

A: No.

Q: Was he one to complain a lot about his physical condition or about how he felt on any given occasion?

A: No.

Q: Does your husband get out of the house much these days?

A: Oh, we will get out once in a while in the afternoon and go downtown and have coffee with some of his friends.

Q: Downtown St. Charles?

A: Yes.

Q: Is that a fairly regular occurrence?

A: Oh, a couple of times a week he will do that now.

Q: Any other outings that he gets on of which you are aware?

A: Not with his friends anymore. It's just if he takes me someplace.

Q: What kind of places might he take you, Mrs. Kroning?

A: Oh, he will take me for groceries or we will go for a short ride on Sunday afternoon, go to church on Sunday morning.

Q: Does riding in a car affect your husband?

A: Yes, it does.

Q: In what way?

A: He gets severe headache and neck pain from it.

Q: How long can you typically go before he needs to stop?

A: A couple of hours, and then he has to get out.

Q: *As compared to before the happening of this accident in 1991, has your husband's outlook on life changed?*

A: *Yes, it has.*

Q: Can you explain that?

A: *Well, we looked so forward to our retirement years. We were going to travel. We were going to see our son a lot. Ou[r] daughter isn't that all ... she isn't that far a drive, but we were going to be up there a lot. We were just even going to take and ... take and travel, not all the time, but enjoy ourselves.*

Q: *What do you foresee now?*

A: *I don't foresee any of that.*

Q: As compared to before the accident, has your husband's sense of humor changed?

A: Yes, it has.

Q: In what way?

A: He still has a slight sense of humor, but, oh, my, he had such a sense of humor. Now, he will try and joke, but before he was always full of jokes and always pulling pranks on me, always ... it was a lot of fun. It was a great life before this accident.

Q: Has this accident had an impact upon your marital relationship now?

A: Yes, it has.

Q: Does your husband seem to have the same level of energy that he did before the accident?

A: No, he hasn't.

Q: Have you noticed from his expressions or gestures that you see nowadays that he is uncomfortable?

A: Yes.

Q: What type of gestures, what do you look for?

A: I know when he is having a bad headache, because he will sit, and he will hold his head, and his forehead wrinkles all up, and then he is holding his neck and holds onto it tight. I don't

know how tight, but he has got his hand up there, and then all of a sudden he is massaging that point.

Q: How frequently do you observe these behaviors?

A: Oh, quite often during the day.

Q: Is it a daily thing?

A: Oh, yes.

Q: Do you alter your behavior when you see these types of things about your husband?

A: Yes, I try to.

Q: In what way?

A: I try to leave him alone, because I know he is in pain. I don't try and irritate him if I ... I try not to. Sometimes I do.

Q: What happens then?

A: Oh, he snaps at me.

Q: What do you mean by that?

A: He gets very irritated with me. That's the only way I guess I can explain it as he gets very irritated with me, because I know he is in pain, and I did something. I don't think he realizes that I knew he was in pain, but I did it anyway, and, oh, I get snapped at.

Q: How does that make you feel?

A: Very bad.

Q: Why?

A: Because I know I irritated him, and he was in pain, and it hurts. It hurts to think that I did that, and it hurts to think that he snaps back, because he never used to do that.

Q: Is he ever physically abusive towards you, Mrs. Kroning?

A: Oh, no.

(Emphasis added.)

There is nothing in any of this testimony which constitutes a lie or suggests that the jury was being misled as to the Kroning's financial situation. It is true that, during her testimony, Mrs. Kroning cried and was very

emotional. In fact, on several occasions, the trial court asked Mrs. Kroning if she was okay and, in one instance, gave her time to regain her composure; however, the record does not support State Farm's contention that Mrs. Kroning sobbed uncontrollably as she described the Kronings' "dire financial straights [sic]"[8] in an attempt to win sympathy from the jury. Even if we assume that Mrs. Kroning "sobbed uncontrollably" in an effort to get the jury to increase the Kronings' damage award, the record does not support State Farm's assertion that it was being done with regard to the Kronings being in dire financial straits. Mrs. Kroning's testimony that her husband had not worked for a wage, which I note in passing supports his wage loss claim, or that, "He provided for us. He saw to all our needs,"[9] even when coupled with tears, simply does not constitute either implicitly or explicitly, a claim of financial destitution. Moreover, the vast majority of Mrs. Kroning's testimony addressed issues related to changes in Mr. Kroning after the accident, such as the severity of his physical and emotional changes, including his inability to travel for long periods in the car, his difficulty doing things around the house, the impact on his ability to do the things they had planned to do during their retirement such as travel, the frequency of his headaches, and his short temper with her, not their personal finances. Mrs. Kroning's testimony, viewed in context and in its entirety, simply does not convey the impression that the Kronings were so utterly impoverished that they were destitute. A careful review of Mrs. Kroning's testimony can only lead to the conclusion that the court of appeals was correct in ruling that her testimony did not "open the door" for the admission of evidence of collateral source payments received by the Kronings.

It is a clear legislative policy that evidence of collateral source payments not be admitted at trial. While I understand the need for

---

8. The American Heritage Dictionary defines "dire" as "[s]o extreme as to require quick remedial action or treatment; *in dire want; dire poverty.*" American Heritage Dictionary 400 (2d College ed.1982).

9. I note that these statements were made in response to a question asking Mrs. Kroning to describe her husband *before* he was injured.

a judicial exception to this legislative policy where a plaintiff lies to or misleads the jury, that exception must be limited.[10] By holding that Mrs. Kroning's testimony opened the door for the admission of evidence of collateral source payments received by the Kronings, the court has usurped the legislature's authority and, legislating from the bench, has effectively done away with the collateral source rule.

Therefore, I dissent.

**10.** The court contends "that the dissent strikes an imbalance between the collateral source rule and Minnesota Rules of Evidence 607." Obviously, I disagree. While the court is correct in stating that Rule 607 trumps the collateral source rule, it seems to me that before the exception to the collateral source can be invoked, the party seeking to introduce evidence of collateral source payments ought to be required to make some showing, by way of impeachment under

GARDEBRING, Justice (concurring in part, dissenting in part).

I join in the special concurrence and dissent of Justice Page.

Rule 607, that the testimony that is claimed to have opened the door to cross-examination on collateral source payments was false or misleading. Here, State Farm made no claim that Mrs. Kroning's testimony was false or misleading and made no effort to impeach her testimony in that regard. State Farm simply asked the trial court to admit evidence of collateral source payments received by the Kronings to test Mrs. Kroning's credibility generally.